# EXHIBIT A





# COMMONWEALTH OF MASSACHUSETTS
## Office of Consumer Affairs and Business Regulation
### DIVISION OF INSURANCE
1000 Washington Street • Suite 810 • Boston, MA 02118-6200
(617) 521-7794 • FAX (617) 521-7475
http://www.mass.gov/doi

CHARLES D. BAKER
GOVERNOR

KARYN E. POLITO
LIEUTENANT GOVERNOR

MIKE KENNEALY
SECRETARY OF HOUSING AND
ECONOMIC DEVELOPMENT

EDWARD A. PALLESCHI
UNDERSECRETARY

GARY D. ANDERSON
COMMISSIONER OF INSURANCE

August 5, 2020

WESTERN SURETY COMPANY
Attn: Jonathan D. Kantor
333 S. Wabash, 43S
Chicago, IL 60604

*Rec'd Law Dept*
*9/11/20*

### Re: Service of Process

Dear Mr. Kantor:

Enclosed you will find legal process which was served upon the Commissioner of Insurance, in his capacity as attorney and registered agent for, Service of Process* for a foreign insurance company, as provided for in Massachusetts General Laws, Chapter 175, §151(3) and §154.

**\* Please note: All future inquiry or correspondence should be directed to the attention of the attorney of record of the enclosed documents.**

Sincerely,

*Stacy Siegan*

Stacy Siegan
Assistant to the General Counsel
(617) 521-7310

Enclosure(s)

*1A723374*

| | | |
|---|---|---|
| **Summons** | CIVIL DOCKET NO.<br><br>2085CV00676 | **Trial Court of Massachusetts**<br>**The Superior Court** |
| CASE NAME:<br><br>MONTACHUSETT REGIONAL TRANSIT AUTHORITY<br><br><br>Plaintiff(s)<br>VS.<br><br>WESTERN SURETY COMPANY<br><br><br>Defendant(s) | | Clerk of Courts<br>Worcester<br>County<br><br>COURT NAME & ADDRESS:<br>Worcester Superior Court<br>225 Main Street<br>Worcester, MA 01608 |

THIS SUMMONS IS DIRECTED TO   WESTERN SURETY COMPANY   (Defendant's name)

<u>You are being sued.</u> The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the   Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

    a) Filing your **signed original** response with the Clerk's Office for Civil Business, Worcester Superior     Court 225 Main Street, Worcester, MA 01608     (address), by mail or in person **AND**

    b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Thomas J. Conte, Esq., Mirick, O'Connell, DeMallie & Lougee LLP 100 Front Street, Worcester, MA 01608

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

A True Copy, Attest

Constable, Boston, MA     Date

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

<p align="center">www.mass.gov/courts/case-legal-res/rules_of_court</p>

#### 4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

#### 5. Required Information on All Filings:

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on _____July 22_____, 20 20 . (Seal)

Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

<p align="center">PROOF OF SERVICE OF PROCESS</p>

I hereby certify that on *August 5, 2020* I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. 4(d)(1-5)):

*By First Class Mail to Western Surety Company at 333 S Wabash, 435, Chicago, IL 60604*

Dated: *8/5/2020*

Signature. *Stacy Siegan*
*STACY SIEGAN*
*MA – DOI*

**N.B.  TO PROCESS SERVER:**

   PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

Date: _____

RECEIVED
AUG – 5 2020
DIVISION OF INSURANCE
LEGAL

rev: 1/2019

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
WORCESTER DIVISION
CIVIL ACTION NO. 2085CV00676

MONTACHUSETT REGIONAL TRANSIT
AUTHORITY,
    Plaintiff

V.

WESTERN SURETY COMPANY,
    Defendant

**AMENDED COMPLAINT**
**AND JURY DEMAND**

## PARTIES

1.    Plaintiff Montachusett Regional Transit Authority ("MART"), is a Massachusetts transit authority organized under M.G.L. c. 161B § 2 with a principal place of business at R1427 Water Street, Fitchburg, Massachusetts.

2.    Defendant Western Surety Company ("Western") is a South Dakota corporation licensed to do business as an insurance company in the Commonwealth of Massachusetts, with offices located at 53 State Street, Suite 510, Boston, Massachusetts.

## FACTS

3.    On or about February 1, 2012, MART and TLT Construction Corp. ("TLT") entered into a Standard Form of Agreement between Owner and Contractor, AIA Document A101-2007, for TLT to construct the North Leominster Commuter Rail Parking Facility, a public construction project, located at 36-44 Nashua Street, Leominster, Massachusetts (the "Project") for the sum of $7,445,800 (the "Contract").

4.      Pursuant to Section 3.3 of the Contract, TLT agreed to achieve substantial completion of its work within five hundred forty-eight (548) days from commencement or August 5, 2013.

5.      Western, the surety of TLT, provided Payment and Performance Bonds in the penal sum of the Contract, which named MART as the owner.  Copies of the Payment Bond and Performance Bond are attached hereto as Exhibit A and Exhibit B, respectively.

6.      In or around August 2013, Western became actively involved with the Project because it began receiving notices of nonpayment from TLT's subcontractors.

7.      In August 2013, both Canatal Steel USA ("Canatal Steel") and Barker Steel, LLC ("Barker Steel") subcontractors of TLT, filed actions alleging that TLT had failed to pay them for their work on the Project.

8.      In or around August 2013, unbeknownst to MART, TLT stopped functioning as a going concern.

9.      Previously, on or about July 11, 2013, also unbeknownst to MART, TLT was denied eligibility to recertify by the Division of Capital Asset Management and Maintenance ("DCAMM") to perform any public construction work in the Commonwealth of Massachusetts.

10.     On or about October 24, 2013, as required by the Performance Bond, MART notified Western that it was considering declaring a contractor default against TLT.  A true and accurate copy of that correspondence is attached hereto as Exhibit C.

11.     Also during October 2013, Western began investigating the bond claims related to the Project.

12.     In the course of addressing the numerous claims arising out of TLT's failure to perform and complete its work on the Project, Western asserted, among other things, that Canatal Steel's claims for winter conditions and home office overhead were barred by the waiver of

consequential damages clauses contained both in its own subcontract and in Section 15.1.6 of the Contract, the terms of which were incorporated into its subcontract.

13.    Western similarly denied Barker Steel's escalation claim for, including, without limitation, the alleged increase in the price of steel.

14.    On November 5, 2013, Western unambiguously and expressly demanded and directed MART not to pay TLT, stating as follows:

> **...Western Surety Co. must direct and demand that no further payments be released to TLT Construction or anyone else, without written consent from my office, as the surety's authorized representative.** (emphasis added).

15.    Western had also issued similar instructions not to pay TLT to approximately eight (8) other owners of projects for which TLT or its sister company, Endicott Constructors Corporation ("Endicott"), was the contractor, and Western was the surety.

16.    After issuing those instructions, Western never released any monies paid to it by any of the project owners to either TLT or Endicott, including, without limitation, the funds it received from MART.

17.    At the time Western was issuing these instructions not to pay TLT to the project owners, the aggregate penal sums of the bonds Western had issued for these projects exceeded One Billion Dollars ($1,000,000,000.00).

18.    Unbeknownst to MART at that time, on or about October 17, 2013, Western, without prior notice to MART, made demand on TLT for its default under the General Indemnity Agreement between Western and TLT (the "GIA"), based on TLT's defaults on a number of public construction projects and the claims being asserted against it based on those defaults, including, without limitation, the MART Project.

19.     Western never informed MART in 2013 that TLT was in default under the GIA, or that it had been terminated from multiple construction projects on which the project owners made demand on Western pursuant to Western's performance bonds.

20.     Under the express terms of the GIA, TLT was required to, among other things, indemnify and save Western harmless from every claim related to the bonds and to pay to Western any such amount as it deemed sufficient to protect it from loss as soon as any liability existed or was asserted against Western.  Moreover, Western was granted the exclusive right to determine for itself and for TLT whether any claim or suit brought against Western or TLT on the bond shall be settled or defended and Western's decision was final and binding upon TLT.

21.     On November 6, 2013, Western filed a lawsuit against TLT in the U.S. District Court for the District of Massachusetts as civil action number 1:13-cv-12804-ADB, asserting claims for, inter alia, indemnification under the GIA, common law indemnity, breach of contract, specific performance, and quia timet/exoneration (the "Western GIA Lawsuit").

22.     In the Western GIA Lawsuit, Western claimed it faced hundreds of bond claims from subcontractors and suppliers, representing potentially millions of dollars in damages, in its capacity as TLT's surety.

23.     In TLT's Answer and Counterclaim in the Western GIA Lawsuit, TLT alleged that Western had improperly instructed the project owners not to pay TLT and, as a result, caused TLT to be unable to perform and complete its work on those projects.  In this regard, TLT asserted:

> Subsequent to October 18, 2013, Western commenced notifying owners of each project of TLT for which Western had executed payment and performance bonds that no further payments were to be made to TLT without the explicit written consent of Western.
> . . .

Western's actions have precluded various [sic] the project owners from making payments to TLT, precluding TLT from cash to perform their general contractor obligations, and precluding funds to pay subcontractors from funds earned.

Western's actions impeded and/or precluded payment to TLT of at least $6,000,000 in contract funds otherwise due TLT for work already performed on various projects.

TLT can not continue work on and/or complete any of the open projects without adequate cash flow with which to fund payroll for its project managers and supervisors.

TLT has reasonable [sic] requested that Western afford TLT some cash flow from monies to be forth coming from various owners to allow TLT to maintain their general conditions on the various projects so they may finish the projects and avoid further damage to both TLT and Western.

. . . despite repeated requests, Western has refused to allow any of the TLT contract funds be [sic] used by TLT to complete any of the projects.

Western's actions have substantially denied TLT the ability to complete the various outstanding projects.

Western' [sic] actions have forced TLT to demobilize from substantially all outstanding projects for lack of funds …

TLT has been threatened with termination based on the failure to perform by numerous owners.

TLT will be terminated on all or substantially all projects in the event that Western continues to deny, interfere and impede the payment of all funds to TLT.

24.     In November of 2013, Western's Senior Surety Claims Counsel spoke with

MART's counsel "for the purpose of funds control" and to ensure "that job bills would be paid …

[and] that the job creditors [TLT's subcontractors and suppliers] would be paid and the money

would not go elsewhere," and months of negotiations ensued.

25.     During the same time frame, Rick Magliozzi ("Magliozzi"), TLT's Project

Manager, through his company, Regency Constructors Northeast ("Regency"), requested that his

company be allowed to finish the Project, which Western rejected.  Regency also filed a payment

bond claim through Western in connection with the project, which Western refused to pay.

26.     On December 19, 2013, Magliozzi, through Regency, brought a lawsuit against Western to recover his fees in connection with the Project and for unfair and deceptive business practices under Chapter 93A (the "Regency Lawsuit").

27.     Prior to the Regency Lawsuit, Western had cut off all communications with Magliozzi, and was not speaking with Thomas V. Kostinden, TLT's President and owner, who refused to provide Western with his email address.

28.     Subsequently, Magliozzi, who previously had typically been on the Project site one day per week, did not return because Western refused to pay him.

29.     After months of discussions and negotiations among counsel, on January 23, 2014, in order for Western to mitigate losses and ensure that the critical contractors could be paid, Western, MART, and TLT entered into a written agreement for MART to pay the balance of the Contract proceeds (the "Contract Balance") to Western directly, except for $5,000 retainage at Western's request, in accordance with Western's direction and demand of November 5, 2013.

30.     Under this agreement, a copy of which is attached hereto as Exhibit D, Western stipulated that the Payment and Performance Bonds remained in full force and effect and all parties reserved all of their rights, including the right to bring claims against each other.

31.     Immediately following the execution of this agreement, MART began issuing payments to Western, who in turn paid subcontractors directly, for the duration of the Project.

32.     Under the terms of the Performance Bond, Western had the option of allowing TLT to complete the Project.

33.     Ultimately, despite repeated pleas from TLT, Western refused to approve TLT as the completion contractor for the Project, refused to fund TLT to complete the Project, and refused to approve Regency and Magliozzi to complete the Project.

34.     After having been involved with the Project for months at Western's request, Vertex Engineering ("Vertex") performed as Western's completion contractor for the Project.

35.     Effective March 3, 2014, after following the lengthy process required by the Contract, MART terminated TLT.  A true and accurate copy of the notice of termination is attached hereto as Exhibit E.

36.     As noted above, Western took over the Project, retained a completion contractor, and obtained a temporary certificate of occupancy on May 19, 2014 and a final certificate of occupancy on September 4, 2014.

37.     TLT materially breached the Contract by, inter alia, failing to achieve substantial completion by August 5, 2013, causing many delays, and failing to timely pay subcontractors, resulting in direct payment claims, bond claims, and lawsuits.

38.     Despite the Western GIA Lawsuit and disputes by and among Western and TLT, upon Western's exclusion from the Arbitration, described below, it joined forces with TLT, assumed the role of lead counsel, and undertook the prosecution of its claims in an effort to recoup the funds it had paid out in connection with TLT's failure to perform on various projects, including the MART Project.

39.     In a transparent effort to try to claw back monies from MART that Western had expended, Western aided, abetted, assisted, supplied legal counsel, and, upon information and belief, financially supported TLT, which had ceased functioning as a going concern years earlier, in asserting claims which it knew or should have known were frivolous and unsupportable and which, in certain circumstances, were actually directly contrary to the positions Western itself had taken on particular issues, such as TLT's and Canatal Steel's claims for consequential damages.

40.     Following TLT's termination in March, 2014, TLT asserted that it was entitled to payment for change order requests, pass through claims and winter conditions claims for its

subcontractor Canatal Steel, escalation costs for its subcontractor Barker Steel, additional subcontractor claims, consequential damages for overhead and profit, damages associated with alleged delays, indemnification costs, and that TLT was wrongfully terminated by MART because MART failed to timely pay it, even though Western, through its Senior Surety Claims Counsel, had unambiguously and expressly demanded and directed MART not to pay TLT on November 5, 2013.

41.     In 2016, just prior to the first mediation and more than two (2) years after its termination, TLT provided MART with Change Order Request 89R, which increased its delay claim from 134 to 339 days and increased its overall claims from $546,110.95 to $1,224,604, a claim which TLT ultimately could no longer prosecute following Magliozzi's deposition testimony in the later Arbitration that it was inaccurate.

42.     On or about March 9, 2017, TLT and MART were ordered to Arbitration.

43.     Attorney Harvey Heafitz ("Attorney Heafitz") represented TLT in the mediations and was representing it when the Arbitration began.

44.     On or about August 7, 2017, Western was excluded as a party from the Arbitration.

45.     Several hours later, also on or about August 7, 2017, Western filed a Motion to Clarify, seeking to reverse that decision and be admitted into the Arbitration.

46.     On or about August 30, 2017, the arbitrator upheld his decision excluding Western from the Arbitration.

47.     On or about September 25, 2017, Western's counsel filed its Notice of Appearance on behalf of TLT.

48.     Thereafter, Western's counsel assumed the role of lead counsel for TLT.

49.    Western, therefore, had its own previously-retained counsel appear in the Arbitration on behalf of TLT to prosecute TLT's claims against MART, upon information and belief, at Western's sole cost and expense.

50.    Subsequently, upon information and belief, Attorney Heafitz ceased playing an active role on behalf of TLT and notably only appeared on the first day of the arbitral hearings. Thereafter, TLT was represented solely by Western's counsel on each of the remaining eight (8) days of hearings.

51.    In the Arbitration, Western's counsel, in its representation of TLT, took positions completely inconsistent with Western's prior positions against TLT and its subcontractors during the Project.

52.    Western had previously expressly rejected certain claims, such as Barker Steel's escalation costs and others, yet in its efforts to recoup funds expended to complete the Project after TLT's default and termination, provided its own counsel to assist TLT in asserting the very claims Western had already denied against MART, and, upon information and belief, funded TLT's prosecution of those claims in the Arbitration.

53.    Moreover, in the Arbitration, because TLT asserted that MART's failure to pay it caused it to fail to meet substantial completion in accordance with the Contract, Western's counsel took the position that its express instructions to MART not to pay TLT was "merely a suggestion."

54.    TLT's averments in the Western GIA Lawsuit, where Western was represented by its current attorneys and TLT was represented by Attorney Heafitz, that Western, not MART, caused TLT to be unable to perform and complete the MART Project, is a binding judicial admission.

55.     Despite this judicial admission, Western's counsel, on behalf of TLT, asserted in the Arbitration that MART, not Western, was the cause of TLT being unable to perform and complete the Project.

56.     Western's counsel and TLT attempted to claim in the Arbitration that Western did not pay much money, beyond the cost of its completion contractor's fees, to complete the MART Project, in an effort to support TLT's claim and unilateral declaration – rejected by the Engineer of Record – that it had purportedly reached substantial completion on December 18, 2013 and, therefore, was wrongfully terminated during March 2014.

57.     Previously, however, Western's Senior Surety Claims Counsel provided an affidavit dated September 25, 2014 (the "Western Affidavit") in the Western GIA Lawsuit, in which Western, through claims counsel, admitted that in each instance in which Western completed a project, including the MART Project, "the cost to complete … **greatly exceeded** the balance of the remaining contract funds… ." (emphasis added) and that Western incurred over $20,000,000 in damages as of the date of the Western Affidavit, which was filed approximately seven (7) months after TLT had been terminated from the MART Project. A copy of the Western Affidavit is attached hereto as Exhibit F.

58.     Thus, in the Arbitration, Western, through TLT, actively contradicted its own prior positions and/or its own judicial admissions in the Western GIA Lawsuit in an effort to claw back the funds it expended to complete the Project.

59.     Western, through TLT, asserted claims and positions which it had previously denied in the course of its dealings with TLT and its subcontractors in an effort to claw back the funds it expended to complete the Project.

60.     Western engaged in an unfair and deceptive scheme in which it wrongfully attempted to claw back the settlement monies it expended as required pursuant to its bond

obligations, by wrongfully pursuing MART, through TLT, by, among other things, having its own

counsel represent TLT, at Western's expense, and taking positions in support of TLT's claims

that Western had previously rejected, including, without limitation, claims for extra time, winter

conditions, overhead, legal fees, escalation, delays, and change order requests.

61.     Western, through TLT, brought a wrongful termination claim against MART

predicated on instructions from Western to MART that MART was not to pay TLT _any_ additional

monies.

62.     Under the terms of the parties' Performance Bond, Western, _inter alia_, failed to

pay approximately $214,829.63 in MART's design professional fees, owner representative fees,

and interest related to TLT's delays in reaching substantial completion, and by causing MART to

incur and failing to pay for hundreds of thousands of dollars in attorneys' fees, expert fees, and

costs in defending itself against Western's pretextual and wrongful claims, brought by and

through TLT and by Western's own previously retained counsel, despite its obligations under the

Performance Bond.

63.     Under the express terms of Section 7 of the Performance Bond, "the Surety is

obligated ... for ... additional legal, design professional and delay costs resulting from the

Contractor's Default ..."

64.     Moreover, because Western chose to complete the Project itself as it was

authorized to do under Section 5.2 of the Performance Bond, its exposure is not limited to the

penal sum of the bond pursuant to Section 8.

65.     On or about April 17, 2018, MART served a demand letter on Western in accord

with G.L. c. 93A. A true and accurate copy of that correspondence is attached hereto as

Exhibit G.

66.     In its response to that demand dated April 26, 2018, a copy of which is attached hereto as Exhibit H, Western stated:

> TLT, since MART's termination for default action, has consistently argued that said action by MART constituted wrongful default and that MART's construction practices and payment practices were breaches of the bonded Construction Contract. Western submits that it used the utmost good faith in completing the contract work, despite TLT's position and Western's own suspicions that TLT might have allegations that would warrant a finding of "Owner Default" as defined by the Performance Bond, which would mean that Western would have no obligation or liability under the Performance Bond to MART.

67.     At the time that Western made these specious assertions against MART, Western knew that it had already rejected most, if not all, of TLT's claims itself when those claims were presented to it by TLT. Despite Western's rejection of those claims when presented by TLT, Western's own counsel would later assert many, if not all, of those previously rejected TLT claims against MART in the Arbitration, with Western's blessing, testimony and financial backing. At the time Western adopted and asserted these previously denied claims through its straw TLT, Western knew that TLT had not paid subcontractors, that TLT misrepresented by certifying that it had paid subcontractors when it had not, that Western had specifically instructed MART not to pay TLT any monies, that TLT was in default under the GIA, that TLT had defaulted on many other public projects in which Western was its surety, that Western had rejected using TLT and/or its project manager, as completion contractor, that TLT's delay claim of 339 days was frivolous and not compliant with the Contract, and that the Project had not been substantially completed on time, because of TLT's breaches and not because of any conduct on the part of MART.

68.    For all of these reasons, Western's response deliberately misrepresented pertinent facts in contravention of G.L. c. 176D, §3(9)(a), was not advanced in good faith, and was wholly without basis in law or fact.

69.    The Arbitration was conducted over nine days in June and July, 2018.

70.    On or about November 14, 2018, the Arbitrator issued her final award, a copy of which is attached hereto as Exhibit I.  Among other things, the Arbitrator found: (1) MART terminated TLT for cause under Section 14.2 of the Contract; (2) TLT materially breached the Contract by failing to achieve substantial completion by August 5, 2013; (3) TLT materially breached the Contract by failing to pay its Subcontractors; (4) TLT failed to carry its burden of proof on its delay claims because, inter alia it never submitted a time impact analysis, it never provided MART with written notice of the estimated additional contract time needed for each change order request, and it failed to exhaust available project "float;" (5) the waiver of consequential damages contained in Section 15.1.6 of the Contract precluded TLT's claims for consequential damages; (6) TLT's claim for winter conditions on behalf of Canatal Steel failed because it was non-compensable under Section 15.1.6, and, in the alternative, TLT had failed to provide credible evidence supporting those claims, and there was no evidence that Canatal's claims were assigned to TLT and therefore TLT lacked standing to assert those claims; and (7) MART was entitled to $134,268.52, plus interest, for additional fees paid to the Project's engineer and the owner's representative due to the delay in achieving substantial completion.

71.    On or about November 13, 2018, MART served a second demand on Western pursuant to G.L. c. 176D and G.L. c. 93A, seeking payment of design professional, delay costs and its additional attorneys' fees in accordance with the Arbitrator's Interim Award.  A true and accurate copy of that demand is attached hereto as Exhibit J.

72.     Western's response was very similar to the prior response described more fully above, again, misrepresenting pertinent facts and asserting allegations it knew to be meritless against MART to mask its own wrongful conduct and that of its principal, TLT.

73.     Indeed, Western rejected both demands and has failed and refused to pay the sums for which it is liable to MART, and failed to make a reasonable offer of settlement.

## COUNT I
### (Breach of Contract)

74.     MART repeats and realleges the allegations set forth in paragraphs 1 through 73 as if fully set forth herein.

75.     MART and Western entered into the Payment Bond and Performance Bond for the Project.

76.     Western breached the parties' Performance Bond agreement by, including, without limitation, failing to pay for MART's approximately $214,829.63 in additional design professional fees, owner representative fees, and delay costs, as well as hundreds of thousands of dollars in attorneys' fees, expert fees, costs, and statutory interest, incurred by MART as a result of TLT's material breaches and contractor default as found by the arbitrator, and incurred by MART in having to defend itself against TLT's claims.

77.     MART has suffered damages as a result of Western's breaches of contract in an amount to be determined at trial.

## COUNT II
### (Unfair and Deceptive Acts or Practices in Violation of G.L. c. 93A)

78.     MART repeats and realleges the allegations set forth in paragraphs 1 through 77 as if fully set forth herein.

79.     MART and Western are engaged in trade or commerce in the Commonwealth of Massachusetts and their contract and Western's conduct thereunder took place within the Commonwealth of Massachusetts.

80.     Western is engaged in the business of insurance within the meaning of G.L. c. 176D, §1(a).

81.     Western engaged in unfair and deceptive acts and practices by, inter alia, the following acts and/or omissions:

a.    Failing and refusing to pay MART's claims for design professional fees, delay costs, and additional attorneys' fees without conducting a reasonable investigation based on all available information;

b.    Failing to effectuate a prompt, fair and equitable settlement of MART's claims after liability became reasonably clear;

c.    Misrepresenting pertinent facts;

d.    Compelling MART to institute litigation to recover amounts due under the bonds by offering substantially less than the amounts ultimately recovered;

e.    Failing to provide a prompt and reasonable explanation of the basis for its denial of MART's claims against the bonds;

f.    Aiding, abetting, and, upon information and belief, propping up and paying all the legal fees of TLT, which was no longer functioning as a going concern, simply so that TLT could nominally participate in and prosecute claims in the Arbitration in an effort to claw back from MART the funds Western expended to complete the Project and thereby forcing MART to defend itself and expend hundreds of thousands of dollars in legal fees;

g.    Aiding, abetting, and, upon information and belief, financing TLT's prosecution of claims against MART which it knew or reasonably should have known were baseless in fact and law in an effort to claw back from MART the funds Western expended to complete the Project and thereby forcing MART to defend itself and expend hundreds of thousands of dollars in legal fees to defeat frivolous claims;

h.    Aiding, abetting, and, upon information and belief, financing the assertion of claims by TLT, which Western itself had denied, in an effort to recoup

from MART the funds Western expended to complete the Project and thereby forcing MART to defend itself and expend hundreds of thousands of dollars in legal fees to defeat claims which Western itself had deemed meritless;

i.   Aiding, abetting, and, upon information and belief, financing TLT's prosecution of claims against MART, which were contrary to the positions Western asserted and/or the representations it made to the court in the Western GIA Lawsuit, and thereby forcing MART to defend itself and expend hundreds of thousands of dollars in legal fees;

j.   Providing and, upon information and belief, paying for its own previously retained counsel to represent TLT in the Arbitration in an effort to claw back from MART the funds Western expended to complete the Project;

k.   Repudiating the essential purpose of its bond by accepting MART's payment of the Contract Balance to it in order to complete the Project, and then seeking to recover from MART, in bad faith, the very funds it expended to discharge its performance obligations under the bond it issued; and

l.   Acting unreasonably and without good faith in connection with the conduct of the Arbitration and the denial of MART's bond claims.

82.   The actions and inactions of Western as described above and as described in MART's Chapter 93A Demand Letters, including but not limited to its conduct in claims handling and settlement, as well as having its counsel and TLT wrongfully pursue claims against MART by taking positions that are completely contrary to its prior positions in this case and its prior representations to the court in another case, as a bold, pretextual attempt to wrongfully claw back monies that Western was obligated to pay pursuant to its payment bond and performance bond, constitute unfair and deceptive claims practices in the business of insurance which are prohibited by G.L. c. 176D, §3(9).

83.   The actions and inactions of Western as described above and as described in MART's Chapter 93A Demand Letters constitute unfair and deceptive acts or practices as prohibited by both G.L. c. 93A, §§2 and 9 and G.L. c. 176D.

84. As a result of Western's unfair and deceptive claims handling and settlement practices in violation of G.L. c. 93A and G.L. c. 176D, MART has been damaged.

85. Western's unfair and deceptive acts or business practices were willful and intentional.

86. Accordingly, MART has suffered damages in an amount to be determined at trial.

WHEREFORE, the Plaintiff Montachusett Regional Transit Authority demands that this Court:

> a. Enter judgment in favor of MART and against Western for breach of contract on Count I;
>
> b. Award MART its additional legal, design professional and delay costs resulting from the Contractor's default;
>
> c. Enter judgment in favor of MART and against Western for violations of G.L. c. 93A and G.L. c. 176D on Count II;
>
> d. Find that Western's unfair and deceptive acts were willful and intentional and award at least twice but no more than three times MART's actual damages;
>
> e. Award money damages, plus pre-judgment and post-judgment interest on all counts of the Complaint;
>
> f. Award MART the costs of this action, including, without limitation, reasonable attorneys' fees and costs; and
>
> g. Grant such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Montachusett Regional Transit Authority hereby demands a trial by jury on all

issues so triable.

MONTACHUSETT REGIONAL
TRANSIT AUTHORITY

By its attorneys,

/s/ Thomas J. Conte

Thomas J. Conte, Esq.
BBO #566092
Phone:  (508) 860-1523
Fax:     (508) 983-6274
tconte@mirickoconnell.com
Alexandra N. Mansfield, Esq.
BBO #697163
Phone: (508) 929-1644
Fax:     (508) 983-6244
amansfield@mirickoconnell.com
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477

Dated: June 30, 2020

# EXHIBIT A

EXECUTED IN DUPLICATE

Bond No. 929544623

# ▒AIA° Document A312™ – 2010

## *Payment Bond*

**CONTRACTOR:**
*(Name, legal status and address)*
TLT CONSTRUCTION CORP.
A Massachusetts Corporation
One Pope Street, Wakefield MA  01880

**OWNER:**
*(Name, legal status and address)*
Moniachusett Regional Transit Authority
1427R Water Street
Fitchburgh MA  01420

**SURETY:**
*(Name, legal status and principal place of business)*
WESTERN SURETY COMPANY
A South Dakota Corporation
333 S. Wabash Avenue, 41st Floor
Chicago IL  60604

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

AIA Document A312–2010 combines two separate bonds, a Performance Bond and a Payment Bond, into one form. This is not a single combined Performance and Payment Bond.

**CONSTRUCTION CONTRACT**
Date:  February 1, 2012

Amount:   Seven Million Four Hundred Forty Five Thousand Eight Hundred and 00/100 ($7,445,800.00)

Description:
*(Name and location)*
North Leominster Commuter Rail Parking Facility
38-44 Nashua Street, Leominster MA  01453

**BOND**
Date:  February 1, 2012
*(Not earlier than Construction Contract Date)*

Amount:   Seven Million Four Hundred Forty Five Thousand Eight Hundred and 00/100 ($7,445,800.00)

Modifications to this Bond:   ☒ None     ☐ See Section 18

| CONTRACTOR AS PRINCIPAL | SURETY |
|---|---|
| Company:              *(Corporate Seal)* | Company:              *(Corporate Seal)* |
| TLT CONSTRUCTION CORP. | WESTERN SURETY COMPANY |
| Signature: | Signature: |
| Name  Thomas V. Kostinden | Name   Kathleen M Flanagan |
| and Title:  President | and Title:    Attorney-in-Fact |

*(Any additional signatures appear on the last page of this Payment Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*

**AGENT or BROKER:**
Alliant Insurance Services, Inc.
195 Farmington Avenue, Suite 300
Farmington CT  06032
(860) 269-2183

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party;)*
Bruno Fisher
1427R Water Street
Fitchburgh MA  01420

AIA Document A312™ – 2010. The American Institute of Architects.

6

**M000092**

M0000093

§ 1 The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

§ 2 If the Contractor promptly makes payment of all sums due to Claimants, and defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.

§ 3 If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Section 13) of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.

§ 4 When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.

§ 5 The Surety's obligations to a Claimant under this Bond shall arise after the following:

§ 5.1 Claimants, who do not have a direct contract with the Contractor,
  .1  have furnished a written notice of non-payment to the Contractor, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were, or equipment was, furnished or supplied or for whom the labor was done or performed, within ninety (90) days after having last performed labor or last furnished materials or equipment included in the Claim; and
  .2  have sent a Claim to the Surety (at the address described in Section 13).

§ 5.2 Claimants, who are employed by or have a direct contract with the Contractor, have sent a Claim to the Surety (at the address described in Section 13).

§ 6 If a notice of non-payment required by Section 5.1.1 is given by the Owner to the Contractor, that is sufficient to satisfy a Claimant's obligation to furnish a written notice of non-payment under Section 5.1.1.

§ 7 When a Claimant has satisfied the conditions of Sections 5.1 or 5.2, whichever is applicable, the Surety shall promptly and at the Surety's expense take the following actions:

§ 7.1 Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed; and

§ 7.2 Pay or arrange for payment of any undisputed amounts.

§ 7.3 The Surety's failure to discharge its obligations under Section 7.1 or Section 7.2 shall not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim, except as to undisputed amounts for which the Surety and Claimant have reached agreement. If, however, the Surety fails to discharge its obligations under Section 7.1 or Section 7.2, the Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant.

§ 8 The Surety's total obligation shall not exceed the amount of this Bond, plus the amount of reasonable attorney's fees provided under Section 7.3, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

§ 9 Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any construction performance bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

**§ 10** The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for the payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligation to make payments to, or give notice on behalf of, Claimants or otherwise have any obligations to Claimants under this Bond.

**§ 11** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**§ 12** No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the state in which the project that is the subject of the Construction Contract is located or after the expiration of one year from the date (1) on which the Claimant sent a Claim to the Surety pursuant to Section 5.1.2 or 5.2, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

**§ 13** Notice and Claims to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears. Actual receipt of notice or Claims, however accomplished, shall be sufficient compliance as of the date received.

**§ 14** When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

**§ 15** Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor and Owner shall promptly furnish a copy of this Bond or shall permit a copy to be made.

**§ 16 Definitions**
**§ 16.1 Claim.** A written statement by the Claimant including at a minimum:
  .1    the name of the Claimant;
  .2    the name of the person for whom the labor was done, or materials or equipment furnished;
  .3    a copy of the agreement or purchase order pursuant to which labor, materials or equipment was furnished for use in the performance of the Construction Contract;
  .4    a brief description of the labor, materials or equipment furnished;
  .5    the date on which the Claimant last performed labor or last furnished materials or equipment for use in the performance of the Construction Contract;
  .6    the total amount earned by the Claimant for labor, materials or equipment furnished as of the date of the Claim;
  .7    the total amount of previous payments received by the Claimant; and
  .8    the total amount due and unpaid to the Claimant for labor, materials or equipment furnished as of the date of the Claim.

**§ 16.2 Claimant.** An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Construction Contract. The term Claimant also includes any individual or entity that has rightfully asserted a claim under an applicable mechanic's lien or similar statute against the real property upon which the Project is located. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

**§ 16.3 Construction Contract.** The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and all changes made to the agreement and the Contract Documents.

---

M000094

**§ 16.4 Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

**§ 16.5 Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

**§ 17** If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

**§ 18** Modifications to this bond are as follows:

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | *(Corporate Seal)* | Company: | *(Corporate Seal)* |
| Signature: | ______________________ | Signature: | ______________________ |
| Name and Title: | | Name and Title: | |
| Address | | Address | |

**CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.**

# EXHIBIT B

EXECUTED IN DUPLICATE

Bond No. 929544623

# ▓▓AIA® Document A312™ – 2010

## *Performance Bond*

**CONTRACTOR:**
*(Name, legal status and address)*
TLT CONSTRUCTION CORP.
A Massachusetts Corporation
One Pope Street, Wakefield MA 01880

**OWNER:**
*(Name, legal status and address)*
Montachusett Regional Transit Authority
1427R Water Street
Fitchburgh MA  01420

**SURETY:**
*(Name, legal status and principal place of business)*
WESTERN SURETY COMPANY
A South Dakota Corporation
333 S. Wabash Avenue, 41st Floor
Chicago, IL  60604

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

AIA Document A312–2010 combines two separate bonds, a Performance Bond and a Payment Bond, into one form. This is not a single combined Performance and Payment Bond.

**CONSTRUCTION CONTRACT**
Date:  February 1, 2012

Amount:  Seven Million Four Hundred Forty Five Thousand
Eight Hundred and 00/100 ($7,445,800.00)

Description:
*(Name and location)*
North Leominster Commuter Rail Parking Facility
36-44 Nashua Street, Leominster MA  01453

**BOND**
Date:  February 1, 2012
*(Not earlier than Construction Contract Date)*

Amount:  Seven Million Four Hundred Forty Five Thousand
Eight Hundred and 00/100 ($7,445,800.00)

Modifications to this Bond:   ☒ None      ☐ See Section 16

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | *(Corporate Seal)* | Company: | *(Corporate Seal)* |
| TLT CONSTRUCTION CORP. | | WESTERN SURETY COMPANY | |

Signature: _____
Name Thomas V. Kostinden
and Title: **President**

Signature: _____
Name  Kathleen M Flanagan
and Title:  Attorney-in-Fact

*(Any additional signatures appear on the last page of this Performance Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*
**AGENT or BROKER:**
Alliant Insurance Services, Inc.
195 Farmington Avenue, Suite 300
Farmington CT  06032
(860) 269-2183

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party:)*
Bruno Fisher
1427R Water Street
Fitchburgh MA  01420

Init.

AIA Document A312™ – 2010. The American Institute of Architects.

08/10

1

M000088

§ 1 The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

§ 2 If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except when applicable to participate in a conference as provided in Section 3.

§ 3 If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after

    .1   the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;

    .2   the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

    .3   the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

§ 4 Failure on the part of the Owner to comply with the notice requirement in Section 3.1 shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice.

§ 5 When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

§ 5.1 Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

§ 5.2 Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§ 5.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

§ 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

    .1   After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

    .2   Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

§ 6 If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 5.4, and the Owner refuses the payment or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

M000089

**§ 7** If the Surety elects to act under Section 5.1, 5.2 or 5.3, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. Subject to the commitment by the Owner to pay the Balance of the Contract Price, the Surety is obligated, without duplication, for

　.1　the responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

　.2　additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Section 5; and

　.3　liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

**§ 8** If the Surety elects to act under Section 5.1, 5.3 or 5.4, the Surety's liability is limited to the amount of this Bond.

**§ 9** The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, successors and assigns.

**§ 10** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**§ 11** Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after a declaration of Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

**§ 12** Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears.

**§ 13** When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

**§ 14 Definitions**

**§ 14.1 Balance of the Contract Price.** The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

**§ 14.2 Construction Contract.** The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and changes made to the agreement and the Contract Documents.

**§ 14.3 Contractor Default.** Failure of the Contractor, which has not been remedied or waived, to perform or otherwise to comply with a material term of the Construction Contract.

**§ 14.4 Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

**§ 14.5 Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

**§ 15** If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

M000090

§ 16 Modifications to this bond are as follows:

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

CONTRACTOR AS PRINCIPAL                                      SURETY

Company:                        *(Corporate Seal)*    Company:                        *(Corporate Seal)*

Signature: _____            Signature: _____

Name and Title:                                        Name and Title:

Address                                                Address

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

M000091

# **<u>EXHIBIT C</u>**



MONTACHUSETT AREA REGIONAL TRANSIT

**Administrator**
**Mohammed H. Khan**

**MONTACHUSETT REGIONAL TRANSIT AUTHORITY**
1427R Water Street, Fitchburg, Massachusetts 01420
(978) 345-7711 – 1-800-922-5636 – FAX: (978) 345-9807

October 24, 2013

Thomas V. Kostinden
President
TLT Construction Corporation
1 Pope Street
Wakefield, MA 01880-3179

RE:   Further Notice of Default and Final Demand for Accounting
North Leominster Commuter Rail Parking Facility (the "Project")

Dear Mr. Kostinden:

As of this date, Montachusett Regional Transit Authority ("MART") has not received the accounting of the Project it requested on or about August 27, 2013, including, without limitation, remittance copies from TLT's accounting department documenting its requisitions, evidence of MART's payments to TLT Construction Corporation ("TLT") and evidence of TLT's subsequent payments to subcontractors.

Please note that Section 9.6.4 of the General Conditions [AIA Document A201 – 2007] expressly provides that MART "has the right to request written evidence ... that [TLT] has properly paid subcontractors and material and equipment suppliers amounts paid by [MART] to [TLT] for subcontracted Work ...," which evidence TLT is required to provide within seven (7) days of the request. It has now been nearly two months since MART requested TLT's accounting and yet no written evidence of any kind has been received.

Rather, in the intervening fifty-seven (57) days since this written evidence was first requested on August 27, 2013, MART has received Demands for Direct Periodic Payments from two filed subbidders, D&S Commercial Masonry ("D&S") and ICON West Corporation ("ICON") and learned of the filing of two (2) lawsuits against TLT and its bond company, Western Surety Company, brought by Canatal Steel USA and Barker Steel, LLC. Thus, as of this date, MART is aware of at least four (4) subcontractor claims for payment against TLT.

In these circumstances, TLT's silence on this issue and its failure to provide an accounting and written evidence of proper payment of subcontractors can only be viewed as an attempt to conceal its failure to make the payments to subcontractors that it is contractually required to make under the General Conditions. The failure to make proper payments to subcontractors for labor or materials is a material breach of the contract and grounds for its termination for cause.

M007554

In this regard, Section 14.2.1 of the General Conditions provides:

The Owner may terminate the Contractor if the Contractor

> .2          fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and Subcontractors;
>
> .4          otherwise is guilty of substantial breach of a provision of the Contract Documents.

Where grounds for termination for cause exist under Section 14.2.1 exist, MART may, on seven (7) days' written notice terminate TLT, without prejudice to any other rights or remedies available to it, and, among other things "[e]xclude the Contractor from the site and take possession of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor" and "[f]inish the Work by whatever reasonable method the Owner may deem expedient." General Conditions, §§14.2.2, 14.2.2.1 and 14.2.2.3.

For the reasons set for above, MART is considering terminating the contract with TLT for cause under Sections 14.2.1.2 and 14.2.1.4 of the General Conditions and declaring a Contractor Default within the meaning of Sections 3.1, 3.2 and 14.3 of the Performance Bond (AIA Document A312 – 2010). Please provide the requested accounting, including, without limitation, written evidence of subcontractor payments within the next seven (7) days.

Sincerely,

*Bruno O Fisher*

Bruno Fisher
MART Deputy Administrator

cc:    Jeannette Wade, MART – Chief Financial Officer
       Adam Gromelski, MART – Project Manager
       Ted Pifty, MART – Owner's Project Manager
       Steve Berkeley, Jacobs Engineering Group – Engineer of Record
       Western Surety Company
       Alliant Insurance Services, Inc.

# **EXHIBIT D**

## AGREEMENT

This Agreement (the "Agreement") is made this _23rd_ day of January, 2014, by and between (1) **MONTACHUSETT REGIONAL TRANSIT AUTHORITY** (the "MART"), (2) **TLT CONSTRUCTION CORPORATION** ("TLT"), and **WESTERN SURETY COMPANY** ("Western"). The MART, TLT and Western, collectively, (3) shall sometimes be referred to as the "Parties," and individually shall sometimes be referred to as a "Party."

WHEREAS, the MART and TLT entered into a Standard Form of Agreement Between Owner and Contractor (AIA Document A101 – 2007) dated February 1, 2012 (the "Contract") for TLT to construct the North Leominster Commuter Rail Parking Facility, 36-34 Nashua Street, Leominster, MA 01453 (the "Project");

WHEREAS, a dispute has arisen between the MART and TLT in which the MART contends that TLT has not timely paid subcontractors for the Project;

WHEREAS, TLT's surety, Western, has received claims for payment from subcontractors working on the Project; and

WHEREAS, the Parties wish to pay the subcontractors working on the Project amounts that are currently due and owing to ensure that the Project is timely completed.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the MART, TLT and Western agree as follows:

1.  MART will wire the total sum of $651,982.34 to Western, representing payment of TLT Application and Certificate for Payment Nos. 20 ($348,613.48) and 21 ($303,368.86) for the Project. TLT represents and warrants to MART and Western that the amounts listed on Exhibit A are currently due and owing to each respective entity. However, nothing herein shall be construed as a waiver of any of TLT's claims against MART for changes, change order requests, equitable adjustments, or claims set forth in any pending lawsuit(s), nor shall it be construed as a waiver of MART's rights to contest any and all such claims.

2.  Upon receipt of partial and/or final (as applicable) waivers and releases of lien in favor of the MART, TLT and Western, Western will issue payments to each entity in the respective amounts shown on Exhibit A attached to this Agreement.

3.  Western represents that its payment bond and performance bond ("Bonds") remain in effect. However, nothing in this Agreement should be construed as an expansion of any of Western's obligations under its Bonds.

{Practice Areas/LIT/70651/00009/A2485135.DOC}

4.   MART and TLT acknowledge that Western has the discretion to resolve any and all payment bond claims submitted to Western for consideration. To the extent that TLT disagrees with the amount of any settlement effectuated by Western, TLT will reserve its rights to object to any such payment.

5.   To the extent any funds remain after payment of the amounts listed in Exhibit A, Western will retain those funds for payment of any additional and valid payment bond claims received on the Project.  If, after all valid payment bond claims have been resolved any funds remain undisbursed, those undisbursed funds will be available to Western for disposition in accordance with an indemnity agreement executed by TLT and others in favor of Western.

6.   The Parties reserve all of their rights under the Contract and Bonds.

7.   This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which will constitute a single document.

8.   Each Party represents and warrants to every other Party that he or she is duly authorized to execute and deliver this Agreement to the other Parties and to perform his or her obligations under this Agreement.

IN WITNESS WHEREOF, the Parties to this Agreement have caused it to be executed under seal by their respective duly authorized representative.

MONTACHUSETT REGIONAL TRANSIT AUTHORITY

By: *Bruno J. Fisher*
Name: *Bruno J. Fisher*
Title: *Acting Administrator*

Date: *1/23/14*

TLT CONSTRUCTION COMPANY

By: _____
Name:
Title:

Date: _____

WESTERN SURETY COMPANY

By: _____
Name:
Title:

Date: _____

4.    MART and TLT acknowledge that Western has the discretion to resolve any and all payment bond claims submitted to Western for consideration. To the extent that TLT disagrees with the amount of any settlement effectuated by Western, TLT will reserve its rights to object to any such payment.

5.    To the extent any funds remain after payment of the amounts listed in Exhibit A, Western will retain those funds for payment of any additional and valid payment bond claims received on the Project. If, after all valid payment bond claims have been resolved any funds remain undisbursed, those undisbursed funds will be available to Western for disposition in accordance with an indemnity agreement executed by TLT and others in favor of Western.

6.    The Parties reserve all of their rights under the Contract and Bonds.

7.    This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which will constitute a single document.

8.    Each Party represents and warrants to every other Party that he or she is duly authorized to execute and deliver this Agreement to the other Parties and to perform his or her obligations under this Agreement.

IN WITNESS WHEREOF, the Parties to this Agreement have caused it to be executed under seal by their respective duly authorized representative.

MONTACHUSETT REGIONAL TRANSIT AUTHORITY

By: _____

Name:                                                                    Date

Title:

TLT CONSTRUCTION COMPANY

By: _____          January 15, 2014

Name: Thomas V. Katinaen                            Date

Title: President

WESTERN SURETY COMPANY

By: _____

Name:                                                                    Date

Title:

{Prexis Area\LIT\20681\0009\A2485855.DOC}                    2

4.     MART and TLT acknowledge that Western has the discretion to resolve any and all payment bond claims submitted to Western for consideration. To the extent that TLT disagrees with the amount of any settlement effectuated by Western, TLT will reserve its rights to object to any such payment.

5.     To the extent any funds remain after payment of the amounts listed in Exhibit A, Western will retain those funds for payment of any additional and valid payment bond claims received on the Project. If, after all valid payment bond claims have been resolved any funds remain undisbursed, those undisbursed funds will be available to Western for disposition in accordance with an indemnity agreement executed by TLT and others in favor of Western.

6.     The Parties reserve all of their rights under the Contract and Bonds.

7.     This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which will constitute a single document.

8.     Each Party represents and warrants to every other Party that he or she is duly authorized to execute and deliver this Agreement to the other Parties and to perform his or her obligations under this Agreement.

IN WITNESS WHEREOF, the Parties to this Agreement have caused it to be executed under seal by their respective duly authorized representative.

MONTACHUSETT REGIONAL TRANSIT AUTHORITY

By: _____

Name: _____                    Date _____

Title: _____

TLT CONSTRUCTION COMPANY

By: _____

Name: _____                    Date _____

Title: _____

WESTERN SURETY COMPANY

By: _____

Name: *LAWRENCE P. TANMAYA*                    Date 1/15/19

Title: *SENIOR SURETY CLAIM CONSEL*

Exhibit "A"
Leominster/Payables

| Subcontractor | Period Ending | Status | Amount Approved by TLT | Payments by Western Surety |
|---|---|---|---|---|
| Back Bay Concrete | 10/31/2013 | FINAL | 25,614.40 | |
| Bay State Elevator | 10/31/2013 | Progress | 8,592.56 | |
| Builders Hardware | 10/31/2013 | FINAL | 2,009.00 | |
| Cassandra Sign | 10/31/2013 | Progress | 5,890.00 | |
| Chandler Architectural | 10/31/2013 | Progress | 27,208.00 | |
| C.R.C. Steel, LLC. | 10/31/2013 | Progress | 55,845.14 | |
| D&A Steel, LLC. | 10/31/2013 | FINAL | 22,842.81 | |
| D&S Masonry | 10/31/2013 | Progress | Demand for Direct Pay | |
| Heritage Restoration | 10/31/2013 | Progress | 15,524.07 | |
| ICON West Corp. | 10/31/2013 | Progress | 52,520.96 | |
| Independent Concrete | 10/31/2013 | FINAL | | 2,040.00 |
| Leominster Police | 10/31/2013 | FINAL | 640.00 | |
| Marguerite Concrete | 10/31/2013 | Progress | 6,821.00 | |
| Mass Laborers Fund | 10/31/2013 | FINAL | 175.60 | |
| NE Facility Sales | 10/31/2013 | FINAL | | 720.00 |
| R.A. Powell Constr. Corp. | 10/31/2013 | Progress | 82,200.66 | |
| Regency Constructors | 12/7/2013 | progress | Removed per Western | |
| Rip It Up Rentals | 10/31/2013 | FINAL | 125.00 | |
| Roman Iron Works | 10/31/2013 | Progress | 19,152.00 | |
| Robert W. Irvine | 10/31/2013 | Progress | | 96,906.95 |
| Rockwell Roofing | 10/31/2013 | Progress | 34,570.00 | |
| P.J. Spillane Co. | 10/31/2013 | Progress | 86,003.50 | |
| Unerectors, Inc. | 10/31/2013 | Progress | 12,302.50 | |
| | | Subtotal | 460,797.20 | 99,666.95 |

Paid by Western          99,666.95

Total Disbursement:      560,464.15

Date: 01/14/14

# **EXHIBIT E**



MONTACHUSETT REGIONAL TRANSIT AUTHORITY
1427R Water Street, Fitchburg, Massachusetts 01420
(978)345-7711 - 1-800-922-5636 - FAX: (978) 345-9867

**Administrator**
**Mohammed H. Khan**

February 24, 2014

<u>**Via Facsimile & First Class Mail**</u>          <u>**Via Email & First Class Mail**</u>

Thomas V. Kostinden, President              Lawrence P. Jortner, Esquire
TLT Construction Corporation                Western Surety Company
One Pope Street                             333 S. Wabash, Floor 41
Wakefield, MA 01880-2179                    Chicago, IL 60604

RE:     North Leominster Commuter Rail Parking Facility (the "Project")

Dear Mr. Kostinden and Attorney Jortner:

On or about February 17, 2014, Jacobs Engineering Group (by Stephen T. Berkeley, P.E.) ("Jacobs"), in its capacity as the Initial Decision Maker, certified pursuant to §14.2.2 of the General Conditions of the Contract for Construction (AIA Document A201 – 2007) "that sufficient cause exists to terminate TLT [Construction Corporation] pursuant to §14.2.1 of the Contract." A copy of Jacobs' certification pursuant to §14.2.2 of the General Conditions is enclosed.

Based on the foregoing and for the reasons stated in my correspondence to Jacobs dated February 10, 2014, Montachusett Regional Transit Authority ("MART") hereby terminates the contract dated February 1, 2012 by and between MART and TLT Construction Corporation ("TLT") concerning the Project (the "Contract") and the employment of TLT effective seven (7) days from the date of this notice in accord with §§14.2.1 and 14.2.2 of the General Conditions. This termination is without prejudice to any other rights and remedies available to MART under the Contract Documents and applicable law.

Sincerely,

Bruno Fisher
MART Deputy Administrator

Enclosure
cc:     Jason A. Webber, Esquire (*via email and first class mail*)
        Bradford R. Carver, Esquire (*via email and first class mail*)
        Stephen T. Berkeley (*via email and first class mail*)
        Thomas J. Conte, Esquire (*via email and first class mail*)

M007729

# **EXHIBIT F**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WESTERN SURETY COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>TLT CONSTRUCTION CORP., ENDICOTT CONSTRUCTORS CORPORATION, TLT TRUST, SHERWOOD TRUST, AND TK REALTY LIMITED PARTNERSHIP<br><br>Defendants. | CIVIL ACTION NO. 13-12804 |

### AFFIDAVIT OF LAURENCE P. JORTNER

I, Laurence P. Jortner, do hereby depose and state as follows:

I am employed as a senior surety claims counsel for Western Surety Company in Chicago, Illinois, and am the authorized representative for Western Surety Company ("Western"). I have full authority to adjust, manage, defend and prosecute claims on behalf of Western in this lawsuit. I make the statements that follow on personal knowledge or on the basis of the business records of Western, of which I am the keeper.

1. Western Surety Company ("Western") is in the business of, among other things, issuing performance and payment bonds to various contractors to secure their performance on various construction projects.

2. At all times relevant to this action, TLT and Endicott, as principals, are or were in the business of construction contracting.

3. On or about October 26, 2010, TLT, Endicott, TLT Trust and Sherwood executed a General Agreement of Indemnity (the "Indemnity Agreement") for the purpose of indemnifying Western in connection with surety bonds issued by Western, as surety, on behalf of TLT, as principal, for various construction projects. A true and accurate copy of the Indemnity Agreement is attached hereto as Exhibit A.

4. On October 22, 2012 TK Realty executed an "Endorsement A" obligating it to the terms of the Indemnity Agreement, with certain limited exceptions not relevant to this motion. A true and accurate copy of the Endorsement A is attached hereto as Exhibit B.

5. Each of the Defendants, at Paragraph 12 of their respective Answers expressly admitted that they executed the Indemnity Agreement. Specifically, Paragraph 12 of Western's Complaint states:

> 12. "In 2010, Western began to provide surety bonds needed by TLT and/or Endicott in connection with their construction businesses. The bonds provided by Western included performance bonds guaranteeing performance of TLT and/or Endicott for work under the bonded construction contracts, and payment bonds guaranteeing payment for labor and materials provided by TLT and/or Endicott on such bonded projects by its subcontractors and suppliers."

Three of the Defendants answered Paragraph 12 identically:

> 12. "TLT Construction Corp. admits the allegations contained in paragraph numbered twelve of the Complaint."

> 12. "Sherwood Trust admits the allegations contained in paragraph numbered twelve of the Complaint."

> 12. "TLT Trust admits the allegations contained in paragraph numbered twelve of the Complaint."

Defendant TK Realty admitted executing the Endorsement to the Indemnity Agreement:

> 12. "TK Realty Limited Partnership denies the allegations of paragraph numbered twelve, further answering states that TK Realty Limited Partnership admits subsequently executing a limited endorsement to the October 26, 2010 GAI."

6. The Indemnity Agreement at ¶2 states:

> The Indemnitors will indemnify and save [Western] harmless from and against every claim, demand, liability, cost, charge, suit, judgment and expense which [Western] may pay or incur in consequence of having executed, or procured the execution of such bonds, or any renewals or continuations thereof or substitutes therefore, including, but not limited, to fees of attorneys, whether on salary, retainer or otherwise, and the expense of procuring, or attempting to procure, release from liability, or in bringing suit to enforce the obligation of any of the indemnitors under this Agreement. In the event [Western] deems it necessary to make an independent investigation of a claim, demand or suit, the Indemnitors acknowledge and agree that all expense attendant to such investigation is included as an indemnified expense. In the event of payments by [Western], the Indemnitors agree to accept the voucher or other evidence of such payments as prima facie

2

> evidence of the propriety thereof, and of the Indemnitors' liability therefore to [Western].

See Exhibit A, ¶2

7. The Indemnity Agreement at ¶3 also provides, in part:

> Payment shall be made to [Western] by the Indemnitors as soon as liability exists or is asserted against [Western], whether or not [Western] shall have made any payment therefor. Such payment shall be either equal to the larger of (a) the amount of any reserve set by [Western], or (b) such amount as [Western], in its sole judgment, shall deem sufficient to protect it from loss.

See Exhibit A, ¶3

8. The Indemnity Agreement at ¶5 further provides:

> [Western] shall have the exclusive right to determine for itself and the Indemnitors whether any claim or suit brought against [Western] or the principal upon any such bond shall be settled or defended and its decision shall be binding and conclusive upon the Indemnitors.

See Exhibit A, ¶5

9. The Indemnity Agreement at ¶17 provides:

> The Indemnitors understand and agree that this document is a continuing agreement to indemnify over an indefinite period and that bonds and undertakings issued by [Western] pursuant to this Agreement may vary widely in amounts and nature and that the Indemnitors will be bound by all such bonds and undertakings, and any increase in the penal limits of such bonds and undertakings.

See Exhibit A, ¶17

10. Western, as surety, and acting in reliance upon the Indemnity Agreement, issued numerous payment and performance bonds (collectively the "Bonds") at the request and on behalf of TLT or Endicott, as principals, for various construction projects.

11. Western issued multiple bonds on behalf of TLT and Endicott for a large number of construction projects, including the following:

34453026v1 0953433

| BOND No. | TLT PROJECTS |
|----------|--------------|
| 929565010 | Groton New Center Fire Station |
| 929546324 | Norfolk County Agricultural High School |
| 929544628 | Bridge & Bowman Elementary Schools |
| 929544623 | North Leominster Commuter Rail Parking Facility |
| 929542000 | Boyden Library |
| 929539259 | Swampscott Police Headquarters |
| 929533048 | NH Regional Training Institute & Barracks Facility |
| 929521839 | New Natick Community Senior Center |
| 929521829 | Westwood Public Library |
| 929517417 | Sutton Middle/High School |
| 929509833 | Walpole Public Library |
| 929495586 | Hillsborough County Courthouse Building Renovations |
| 929492740 | Nashua Community College-Health Science & Humanities Project |
| 929421950 | Manchester Essex Middle High School |
| **BOND No.** | **ENDICOTT PROJECTS** |
| 929519155 | Wright-Patterson AFB Shopping Center Marine Upgrade |
| 929495582 | Hanscom AFB Main Store Upgrade |
| 929489448 | Otis AFB Digital Ground Station |
| 929484556 | Newport, RI Building Envelope Repairs |
| 929489445 | Aberdeen Proving Ground, MD |

12. Western has received over 400 payment bond claims on the Bonds with each claimant alleging that TLT or Endicott and Western are liable due to TLT's failure to meet its obligations to such claimants.

4

13. Western, in good faith and pursuant to its obligations as surety, investigated these claims, and is continuing to investigate additional claims as they are received. In addition, TLT was terminated on multiple construction projects and on each of those projects the owners made demand on Western on its performance bonds. In response to those performance bond claims Western has arranged for completion of multiple projects. In each such instance the cost to complete the projects greatly exceeded the balance of the remaining contract funds causing a loss to Western.

14. Western has incurred and continues to incur losses and expenses, including attorneys' fees, which the Indemnitors are required to reimburse Western under the terms of the Indemnity Agreement.

15. To date, Western has paid claims, incurred completion costs as well as paid consulting expenses and reasonable attorneys' fees, in excess of $20,000,000 in satisfying its obligation under the Bonds in good faith as well as pursuing its right under the Indemnity Agreement. A true and accurate copy of Western's losses and expenses as of September 16, 2014 is attached hereto as Exhibit C.

16. Western anticipates suffering further losses and expenses, including but not limited to those incurred in the prosecution of this action, all of which are recoverable from the Defendants under the specific terms and conditions of the Indemnity Agreement.

17. In accordance with its rights under the Indemnity Agreement, Western has made repeated demands upon the Defendants to hold Western harmless from all losses, costs, and expenses Western has incurred, or reasonably expects to incur.

18. At all times relevant hereto, Western has acted in good faith, and the disbursements identified herein, were made under the belief that Western was liable for the sums and amounts so disbursed, or that it was necessary or expedient for Western to make such disbursement.

19. Defendants have refused and/or failed to reimburse Western in accordance with their obligation under the Indemnity Agreement.

20. Defendants admitted executing the Indemnity Agreement, which provides that the Indemnitors are required to:

> Indemnify and save [Western] from and against every claim, demand, liability, cost, charge, suit, judgment and expense which [Western] may pay or incur in consequence of having executed, or procured the execution of such bonds, or any renewals or continuations thereof or substitutes therefor, including but not limited to fees of attorneys, whether on salary, retainer or otherwise, and the expense of procuring, or attempting to procure, release from liability, or in bringing suit to enforce the obligation of any of the Indemnitors under this Agreement. In the event [Western] deems it necessary to make an independent investigation of a claim, demand or suit, the Indemnitors acknowledge and agree that all expenses attendant to such investigation is included as an

5

34453026v1 0953433

indemnified expense.  In the event of payment by [Western], the Indemnitors agree to accept the voucher or other evidence of such payments as prima facie evidence of the propriety thereof, and of the Indemnitors' liability therefor to [Western].

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 25th DAY OF SEPTEMBER, 2014.

_____
Laurence P. Jortner
Senior Surety Claims Counsel
Western Surety Company


_____
Notary Public
My Commission Expires:


"OFFICIAL SEAL"
LINDA C. DEMPSEY
Notary Public, State of Illinois
My Commission Expires 10/19/14

6

34453026v1 0953433

# **EXHIBIT G**

# MIRICK O'CONNELL

A T T O R N E Y S   A T   L A W

Thomas J. Conte
Mirick O'Connell
100 Front Street
Worcester, MA  01608-1477
tconte@mirickoconnell.com
t 508.860.1523
f 508.983.6274

April 17, 2018

**VIA EMAIL, FIRST-CLASS MAIL, AND CERTIFIED MAIL R/R/R**

Western Surety Company
Attention: Laurence P. Jortner, Senior
  Surety Claims Counsel
333 S. Wabash Ave., 41-South
Chicago, IL 60604

CNA Surety
Surety Claims
333 S. Wabash Ave., 41-South
Chicago, IL 60604

Re: **Montachusett Regional Transit Authority; Western Surety Company Performance Bond No. 929544623; Payment Bond No. 929544623; North Leominster Commuter Rail Parking Facility, 36-44 Nashua Street, Leominster, Massachusetts;**

**Canatal Steel USA v. TLT Construction Corporation et al Middlesex County Superior Court Civil Action No. 1381CV04262;**

**Barker Steel LLC v. TLT Construction Corp. et al Middlesex County Superior Court Civil Action No. 1781CV00002; and**

**TLT Construction Corp. v. Montachusett Regional Transit Authority JAMS Arbitration No. 14 00016619**

Dear Sir/Madam:

This firm represents Montachusett Regional Transit Authority ("MART") in connection with the above-referenced matters. This serves as a demand against Western Surety Company ("Western") for unfair and deceptive claims handling and settlement practices under Massachusetts General Laws Chapter 93A and Chapter 176D.

On or about February 1, 2012, MART and TLT Construction Corp. ("TLT") entered into a Standard Form of Agreement between Owner and Contractor, AIA Document A101-2007, for TLT to construct the North Leominster Commuter Rail Parking Facility, located at 36-44 Nashua Street, Leominster, Massachusetts (the "Project") for the sum of $7,445,800 (the "Contract"). Pursuant to Section 3.3 of the Contract, TLT agreed to achieve substantial completion of its work within five hundred forty-eight (548) days from commencement or August 5, 2013. Western, the

---

Client Matter/20681/00015/A5392819.DOCX[Ver:3]

## MIRICK O'CONNELL

Western Surety Company
CNA Surety Corporation
April 17, 2018
Page 2

surety of TLT, provided payment and performance bonds in the penal sum of the Contract, which named MART as the owner.

TLT failed to achieve substantial completion in accordance with the Contract, caused many delays, and failed to timely pay subcontractors, resulting in direct payments claims, bond claims, and lawsuits. When TLT was terminated, Western took over the Project and contended that it completed the work under the Contract on or about September 4, 2014. However, based on the report of MART's construction expert, a copy of which was previously provided to Western's and TLT's counsel at Hinshaw & Culbertson, LLP ("Hinshaw"), Western failed to correct TLT's deficient work as required under the performance bond. Based on that report, it is estimated that it will cost approximately $2,900,000 to repair the garage to bring it into compliance with the Contract.

Following TLT's termination in March, 2014[1] and two subsequent mediations, TLT asserted in the arbitration that it was entitled to payment for change order requests ($353,840.70), pass through claims and winter conditions of Canatal Steel ($350,809), a subcontractor, escalation costs of Barker Steel ($23,975.69), a subcontractor, additional subcontractor claims, consequential damages for overhead and profit, delays (339 days), indemnification costs ($164,000), and that TLT was wrongfully terminated by MART because MART failed to timely pay it, even though Western, through its Senior Surety Claims Counsel, Laurence P. Jortner ("Jortner"), had unambiguously and expressly demanded and directed MART not to pay TLT on November 5, 2013, following MART's notice to Western on October 24, 2013, that it was considering declaring a contractor default against TLT for the reasons stated above.[2] Jortner stated as follows:

> **...Western Surety Co. must direct and demand that no further payments be released to TLT Construction or anyone else, without written consent from my office, as the surety's authorized representative.**

(emphasis added).

---

[1] It bears noting that Western never proposed using TLT as its completion contractor pursuant to Section 5.1 of the Performance Bond. Moreover, Rick Magliozzi of Regency Constructors Northeast, Inc. ("Northeast"), who served as TLT's project manager, requested that his company be allowed to finish the project. When Western rejected Magliozzi's and Northeast's claim for payment, Northeast filed a lawsuit against Western on December 20, 2013 for unfair and deceptive business practices. In that lawsuit, Northeast was represented by Harvey Heafitz, Esquire ("Heafitz") and Western was represented by Hinshaw.

[2] TLT has since reduced its delay claim to 134 days as well as its substantive claims against MART, which now total $1,427,939.29.

MIRICK O'CONNELL

Western Surety Company
CNA Surety Corporation
April 17, 2018
Page 3

MART followed Western's instructions, as directed, and paid Western the balance of the Contract sum pursuant to an agreement between MART, TLT, and Western dated January 23, 2014. It is undisputed that MART paid the balance of the Contract sum to Western.[3]

MART, TLT, and Western mediated TLT's claims on two different dates with two different professional mediators, whereby representatives of TLT prematurely walked out of both mediations when MART did not accept the proposals TLT wanted. Just prior to the first mediation, in 2016, TLT provided MART with Change Order Request 89R, which increased its delay claim from 134 to 339 days and increased its overall claim from $546,110.95 to $1,224,604. Thereafter, TLT and MART were ordered to arbitration.

TLT had been represented by Heafitz in the mediations and in the arbitration. However, when Western was excluded from the arbitration by the order of the arbitrator, Western, a material witness in the arbitration, had its own counsel, Hinshaw, appear in the arbitration on behalf of TLT along with Heafitz, to prosecute TLT's claims against MART, upon information and belief, at Western's expense. Meanwhile, Hinshaw continues to represent both Western and TLT. It bears noting that the arbitral hearings are scheduled for June, 2018, and Jortner is listed as a witness on both TLT's and MART's witness lists.

In the arbitration, Western's counsel, in its representation of TLT, has taken positions completely inconsistent with Western's prior positions against TLT and its subcontractors during the Project. Western purportedly expressly rejected certain claims, such as Barker's escalation costs and others, yet Western has now incentivized TLT, and provided Western's own counsel, to assist TLT in asserting these very same claims against MART. Western settled various claims of job creditors for this Project that TLT failed to pay pursuant to its payment bond obligations. Despite MART's repeated requests, Western, for obvious reasons, has refused to produce an accounting for those payments, including, without limitation, the backup documentation submitted by each job creditor, the payments Western made to each job creditor, and all of the agreements and releases signed by the job creditors.

Moreover, in the arbitration, Western has even had its counsel take the position that its express instructions to MART not to pay TLT, which TLT has used as the basis for its wrongful termination claim against MART, was "merely a suggestion" or words to that effect, which flies in the face of the facts, Western's conduct, TLT's judicial admissions, and well settled suretyship law, which required MART to follow Western's instructions or be exposed to Western's claims of overpayment and/or potentially obviate Western's obligations under the performance bond.

It bears noting that unbeknownst to MART at the time, on November 6, 2013, Western filed a lawsuit against TLT in U.S. District Court in Massachusetts alleging that Western was entitled to indemnity from TLT as a result of TLT's default or termination on numerous public

---

[3] Except for $5,000, allowing the parties to reserve their rights.

# MIRICK O'CONNELL

Western Surety Company
CNA Surety Corporation
April 17, 2018
Page 4

construction projects in 2013, including the MART Project, for which Western was the surety and faced hundreds of bond claims from subcontractors and suppliers, representing potentially millions of dollars in damages. Western was represented by Hinshaw and TLT was represented by Heafitz in that lawsuit.

In TLT's answer and counterclaim to Western's lawsuit, TLT averred that Western improperly instructed all of the owners of those projects not to pay TLT any additional monies and, as a result, <u>Western caused TLT to be unable to perform and complete those projects, including the MART Project.</u> TLT's averment in that lawsuit constitutes a judicial admission by TLT that Western, not MART, caused it to be unable to perform and complete the MART Project. Despite this judicial admission, Western's counsel, on behalf of TLT, has been asserting in the arbitration that MART was the cause of TLT being unable to perform and complete the Project.[4] Based on TLT's judicial admission, this fact has already been definitively proven.

Along the same lines, Western's and TLT's counsel has alleged in the arbitration that Western did not pay much money, beyond the cost of its completion contractor's fees, to complete the MART Project, in support of TLT's claim and unilateral declaration that it had purportedly reached substantial completion on December 18, 2013. However, as noted, Western has refused to provide the accounting for its payments referenced above. Moreover, in the federal court litigation against TLT, Jortner of Western provided an affidavit dated September 25, 2014, in which he admitted that in each instance in which Western completed a project, including the MART Project, "the cost to complete … greatly exceeded the balance of the remaining contract funds… ." Moreover, as of the date of the affidavit, Jortner also admitted that Western had incurred in excess of $20,000,000 in paid claims, completion costs, etc., resulting from TLT's breaches and those of its sister company. Western, through TLT, cannot now contradict Jortner's Affidavit, as it seeks to do through its own counsel's representations in the arbitration.

MART contends that Western is now engaged in an unfair and deceptive scheme in which it is wrongfully attempting to claw back the settlement monies it expended as required pursuant to its bond obligations, by wrongfully pursuing MART, through TLT, by among other things, having its own counsel represent TLT, at Western's expense, and having it take positions in support of TLT's claims that Western had previously rejected, including, without limitation, claims for extra time, winter conditions, overhead, legal fees, escalation, delays, and change order requests.

Western's conduct in this matter concerning claims handling and settlement, as well as having its counsel and TLT wrongfully pursue claims against MART by taking positions that are completely contrary to its prior positions in this case and its prior representations to the court in

---

[4] In that lawsuit, Western, through its counsel, Hinshaw, filed a Motion to Disqualify Heafitz from representing TLT.

## MIRICK O'CONNELL.

Western Surety Company
CNA Surety Corporation
April 17, 2018
Page 5

another case, is a bold, pretextual attempt to wrongfully claw back monies that Western was obligated to pay pursuant to its payment bond and performance bond for the MART Project.

As a result of Western's unfair and deceptive claims handling and settlement practices in violation of G.L. c. 93A and G.L. c. 176D, MART has been damaged. Western breached its bond obligations to MART by failing to correct TLT's deficient work in the amount of approximately $2,900,000, as set forth in MART's expert report, by failing to pay for approximately $175,000 in design professional fees and owner representative fees incurred by MART due to Western's and TLT's delays in reaching substantial completion, and by causing MART to incur hundreds of thousands of dollars in attorneys' fees, expert fees, and costs in defending itself against Western's pretextual and wrongful claims, brought by and through TLT and Western's own counsel. These damages incurred by MART, totaling approximately $3,775,000, could be doubled ($7,550,000) or trebled ($11,325,000), plus interest of $1,812,000 (4 years at 12% per year), for potential total damages of approximately $13,137,000. It bears noting that because Western chose to complete the Project itself, its exposure is not limited to the penal sum of the bond pursuant to Section 8.

For the foregoing reasons, MART demands payment from Western of $3,775,000 in settlement of this matter.

We look forward to hearing from you within thirty (30) days as prescribed by statute.

Sincerely,

Thomas J. Conte

TJC/srm

cc:     Paula-Lee Chambers, Esq. (*via email*)

# **<u>EXHIBIT H</u>**

# **CNA** SURETY

333 S. Wabash Avenue, 41st Floor, Chicago, IL 60604

**Laurence P. Jortner**
Claim Director
Telephone    (312)822-8077
Facsimile    (312)755-7278
Laurence.Jortner@cnasurety.com

April 26, 2018

Thomas J. Conte, Esq.
Mirick O'Connell
100 Front Street
Worcester, MA 01608-1477

*Via E-mail: tconte@mirickoconnell.com & Regular Mail*

| | |
|---|---|
| Principal: | TLT Construction Corp. |
| Surety: | Western Surety Company |
| Obligee: | Montachusetts Regional Transit Authority |
| Bond No.: | 929544623 |
| Project: | North Leominster Commuter Rail Parking Facility, 36-44 Nashua Street, Leominster MA 01453 |
| Claim No.: | 9A723374-78720 |

Dear Mr. Conte:

In response to your letter of April 17, 2018, Western Surety Co. ("Western") fully denies any liability and finds your allegations and demands for payment both unsupported and utterly meritless. Western's main reasons supporting its findings and position will be briefly discussed below. However, the following comments do not and are not meant to constitute an exhaustive recitation of Western's reasons for denying the claims and allegations contained in your letter.

Your allegations and demands divide into two general categories. One category argues that: "MART contends that Western is now engaged in an unfair and deceptive scheme in which it is wrongfully attempting to claw back the settlement monies it expensed...by wrongfully pursuing MART, through TLT..." The second alleges unfair claims practices based upon allegations that "...Western breached its bond obligations to MART by failing to correct TLT's deficient work in the amount of approximately $2,900,000..." and other damages alleged at the end of your letter.

Regarding the first, even if Western were solely seeking collection action against MART, it would not constitute an unfair business practice and there certainly has been no deception. To disprove these allegations, one needs to look no further than the enclosed August 31, 2015 e-mails between us. In that e-mail, you inquired whether the requisition was for final payment. I responded that Western had submitted its requisition after completing the work for the entire remaining balance, less $5,000, specifically to reserve claim rights. Your response: "Ok". MART than made its last payment on the contract of $54,805.15, which is exactly the $59,805.15 value, placed by MART upon remaining punch list items after submission of Requisition 14, less $5,000. It bewilders Western as to why you thought it was okay in 2015 and consider it an unfair claim practice in 2018.

Second, the release of that payment, the aforementioned e-mail and other communications from

**CNA** SURETY                    -2-                    April 26, 2018

MART, including those of MART's Facilities/Project Manager, Robert Benoit conclusively show that MART had determined for itself that the project was complete and voluntarily released the contract balance, less the $5,000 that Western requested to be withheld solely for the preservation of TLT's and Western's legal rights and not because there was any work deemed incomplete by MART.

Given the foregoing and without going any further (although Western certainly could), Western confidently submits that:

1. MART (and in fact you specifically) knew that TLT and Western were both preserving their claims against MART, whether via pass-through claims such as those of TLT subcontractors (e.g. Canatal and Barker) or TLT's direct claims against MART before making final payment, less $5,000.

2. Western paid every payment bond claim and fully held MART harmless, completed the job to the full satisfaction of MART at the time and is entitled to use the adjusted contracted balances, including those that might be due after litigation of claims against MART, to mitigate its bond losses.

3. Western responded to MART's Performance Bond claim by effecting the completion of the bonded Construction Contract, as determined by MART's own findings and conduct in 2015, and Western further specifically preserved its claim rights via full notice to and acquiescence by MART.

Additionally, Western asserts that it has no liability with regard to the demands in your letter for the following reasons:

A. The Performance Bond is a contract of surety; as opposed to an insurance policy. As such, multiple claims cannot be made under the Performance Bond. The one that was made was responded to by Western and the Construction Contract work was acknowledged as completed by MART.

B. MART is collaterally estopped from asserting that the work is incomplete, both by its last payment to Western and its numerous prior written and other statements and/or conduct to the contrary.

C. Sec. 11 of the subject Performance Bond requires that: "Any proceeding, legal or equitable, under this Bond...shall be instituted within two years after a declaration of Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable."

Western submits that the governing Massachusetts law does not alter the language or enforceability of Section 11 and that, even under your own version of events; your claims against the Performance Bond are barred by the suit limitations, as well as any other applicable statutes of limitation that may be found to apply.

**CNA SURETY**                    -3-                    April 26, 2018

D. TLT, since MART's termination for default action, has consistently argued that said action by MART constituted wrongful default and that MART's construction practices and payment practices were breaches of the bonded Construction Contract. Western submits that it used the utmost good faith in completing the contract work, despite TLT's position and Western's own suspicions that TLT might have allegations that would warrant a finding of "Owner Default" as defined by the Performance Bond, which would mean that Western would have no obligation or liability under the Performance Bond to MART.

E. Western relies upon and fully reserves any and all contractual rights and defenses that may be otherwise properly available to TLT or Western, as surety, including all condition precedents under the bond or other rights, at law and/or in equity, under the applicable bonds and contracts or otherwise.

F. The aforementioned allegations by TLT are now the subject of arbitration between TLT and MART. Although Western is not a party to this arbitration, including the subcontract pass-through claim disputes, Western will continue to follow this proceeding with interest and continues to fully maintain and reserve all rights, remedies and defenses with regard to any claims that may be asserted against it and also with regard to any and all subrogation rights against all parties as may be liable.

In closing, Western finds much of your letter to contain statements that are inaccurate, out-of-context and often irrelevant. Rather than wade through all of them, Western simply has fully rejected your claims and reserves the right to respond to the balance of your letter as may prove necessary in an appropriate legal forum.

Sincerely,

Laurence Paul Jortner

Laurence P. Jortner
Authorized Representative of
Western Surety Company

Enclosure

cc: Paula-Lee Chambers, Hinshaw & Culbertson, Harvey Heifitz, Esq.; Brad Carver, Esq., Hinshaw & Culbertson (all via e-mail)

# **<u>EXHIBIT I</u>**

JAMS ARBITRATION
REFERENCE NO. 14 00016619


TLT CONSTRUCTION CORP.,
Claimant and Counter-Respondent

v.

MONTACHUSETT REGIONAL TRANSIT AUTHORITY,
Respondent and Counterclaimant


### FINAL AWARD

This arbitration arises from construction of the North Leominster Commuter Rail Parking

Facility located at 36-44 Nashua Street in Leominster, Massachusetts ("the Project"). The

general contractor was Claimant TLT Construction Corp. ("TLT"). The Project Owner was

Respondent Montachusett Regional Transit Authority ("MART").

*Procedural History in Court*

This arbitration is what remains of a large group of disputes arising out of the Project

between and among TLT, Canatal Steel USA, In. ("Canatal"), and Western Surety Company

("Western"), TLT's surety. Litigation began with an action filed in Middlesex Superior Court in

October 2013. *Canatal Steel USA, Inc. V. TLT Construction Corp.*, Middlesex Superior Court,

Civil Action No. 1381 CV 04262 ("the Middlesex Action"). In the Middlesex Action, TLT was a

defendant and, as of November 9, 2013, a third party claimant against MART.

On October 6, 2016, all parties in the Middlesex Action participated in a mediation which

resulted in resolving all disputes between and among TLT, Western and Canatal. The third party

claims solely between TLT and MART were not settled. After the mediation, TLT filed a motion

in the Middlesex Action to compel arbitration and stay proceedings, which MART opposed. On March 9, 2017, Superior Court Judge Gary Inge allowed TLT's motion.

*Relevant Procedural History at JAMS*

By letter dated April 21, 2017, TLT's counsel requested arbitration through JAMS. The letter stated, among other things, that the parties agreed the arbitration would proceed before the Hon. Allan van Gestel (ret.) ("the Predecessor Arbitrator"). On August 3, 2017, Judge van Gestel held a Preliminary Conference by phone. One issue discussed during the call was identification of TLT's arbitration claims because TLT had not filed a Demand for Arbitration with JAMS setting forth its specific claims.

After the phone conference, in a written Order dated August 7, 2017, Judge van Gestel stated, among other things: "The pleadings controlling this arbitration shall be a Notice of Claims, to be filed by TLT on or before August 14, 2017, and a Response thereto, to be filed by MART on or before August 21, 2017. See JAMS Rule 9(a)."

On August 15, 2017, TLT filed its Notice of Claims, which alleged breach of contract but did not allege quantum meruit. On August 17, 2017, TLT's counsel wrote MART, copying Judge van Gestel, stating in relevant part: "in referencing what we consider to be MART's breach of contract I did not intend to only reference a 'breach of contract claim' but of course would expect to also pursue 'quantum meruit' as an action in the arbitration".

In an Order dated September 15, 2017, Judge van Gestel referenced his August 7th Order and stated that his "directive (regarding pleadings) was issued pursuant to (JAMS Rule 9A) because, prior to that time, TLT had not stated its claims in this arbitration".

On October 4, 2017, Judge van Gestel issued an Order repeating his earlier written directive that the pleadings "controlling this arbitration shall be the Notice of Claims, filed by

TLT on August 14 (sic), 2017, and the Response thereto (including the Counterclaim therein) filed in MART on August 21, 2017."

On October 10, 2017, TLT filed an Amended Notice of Claims, in which it sought to add a M.G.L. Chapter 93A claim but made no reference to adding a quantum meruit claim. On November 6, 2017, Judge van Gestel allowed MART's Motion to Strike TLT's Amended Notice of Claims.

It should also be noted that Judge van Gestel, in an Order dated August 20, 2017, ruled that Western and Canatal were not parties to this arbitration.

*Selection of Successor Arbitrator*

On January 4, 2018, Judge van Gestel cancelled the arbitral hearing then scheduled to begin January 8th due to controversy over the length and nature of MART's witness list for the hearing. After receipt of the witness list, Judge van Gestel ordered the parties to appear for a Status Conference on January 8, 2018. That morning, Judge van Gestel's JAMS Case Manager notified the parties that Judge van Gestel was "unable to proceed with the Status Conference scheduled for that morning due to a medical emergency."

On January 12, 2018, the Case Manager notified the parties that the Arbitrator "will be unable to proceed with the hearing for several months." On or about that same day, TLT filed a Motion to Replace Arbitrator and Commence Arbitral Hearing. On March 2, 2018, the Case Manager informed the parties of my appointment as Successor Arbitrator. My initial consultation with the parties was held March 20, 1018. Thereafter, I conducted phone and in person hearings, heard pending motions and issued various Orders.

One such Order resulted from MART's Motion in Limine to Preclude TLT's Assertion of Claims Related to Alleged Project Delays, Unapproved Change Order Requests, and Wrongful

3

Termination Based on TLT's Spoliation of Daily Construction Reports. In a Memorandum of Decision and Order issued last April, I allowed MART's alternative motion regarding adverse inferences. In that decision, I concluded that TLT had been contractually obligated to provide MART with Daily Construction Reports and obligated to provide them in discovery. TLT first informed MART on September 7, 2017 that it had "lost" the Daily Reports at the time TLT moved its office during the summer of 2015. I was not persuaded, I stated, that TLT's inability to provide the Daily Reports to MART constituted willful misconduct. But I did conclude, and reiterate now, that TLT's conduct constituted negligence. I stated that I would take that conduct in consideration in weighing the arbitration evidence, and I have done so.

*The Arbitral Hearing*

As Successor Arbitrator, I conducted the arbitral hearing over nine days--June 18 through 22 and July 9 through 12, 2018. The witnesses included Richard (Rick) Magliozzi, Thomas Kostiden, Joe Posteraro, Michael Pellegri, Laurence P. Jortner, Bruno J. Fisher, Philip Helmes, Scott Robins, Stephen Berkeley and David C. Prior. The hearing was court-reported and transcribed. Between them, the parties introduced 201 exhibits into evidence. Except to the extent ruled otherwise, all offered exhibits were received into evidence. After the evidentiary hearing, the parties made various post-hearing submissions. Closing argument occurred on September 11, 2018. Before the closing argument, MART filed two Motions; (i) a motion to strike TLT's quantum meruit claim; (ii) the other to strike Exhibits 137 and 138. For reasons to be discussed, both motions are *allowed*.

A hearing held on October 3, 2018 addressed MART's Motion to Strike TLT's Quantum Meruit claim. At the conclusion of that hearing, the parties agreed that an Award should issue no later than November 2, 2018. I issued an Interim Award on October 31, 2018. In that Award, I

4

reserved decision on an award of interest because the parties had not addressed whether disagreement existed on that issue. On November 12, 2018, the parties notified me that they were able to reach agreement on the interest to be awarded. I set forth their agreement below.

*Relevant Findings of Fact*

Based on the credible evidence adduced at the arbitral hearing and the reasonable inferences therefrom, I find the following relevant facts. To the extent additional credible facts are relevant to the dispute, they are set forth in the Analysis section below.

On February 1, 2012, TLT entered into an AIA A101-2007 Standard Form of Agreement between Owner and Contractor, accompanied by the AIA A201-2007 General Conditions of the Contract for Construction ("the Contract") for construction of the North Leominster Commuter Rail Parking Facility located at 36-44 Nashua Street in Leominster ("the Project"). MART was the Project Owner; TLT the Contractor. The original contract sum was $7,445,800.

Magliozzi, who was not a TLT employee, became TLT's Project Manager. MART's Engineer of Record, also referred to in the Contract as the Architect, was Jacobs Engineering Group Inc. ("Jacobs"). Stephen Berkeley was the principal Jacobs engineer responsible for the Project. Western Surety Company (Western") as surety, issued payment and performance bonds on behalf of TLT.

A Notice to Proceed was issued on February 3, 2012. The Contract called for substantial completion within 548 days. Jacobs issued a certificate of substantial completion for the Project on May 19, 2014, and a Final Certificate of Occupancy issued September 4, 2014.

On February 10, 2014, MART wrote Jacobs, requesting certification under Article 14.2.1 of the Contract that sufficient cause existed for MART to terminate the Contract. As grounds,

MART suggested numerous alleged breaches of the Contract. Kostiden was copied on the letter. On February 11, 2014, TLT wrote MART objecting to its efforts to terminate the Contract.

On February 17, 2014, Jacobs certified to MART that sufficient cause existed to terminate the Contract. Jacobs certified two grounds for termination: first, that TLT "did not reach substantial completion of the project within 548 days of commencement", and second, that "based on correspondence provided to (Jacobs) by MART, that TLT has failed to pay its subcontractors". On or about February 24, 2014, MART terminated the Contract.

TLT was obligated to create, and did, Daily Reports to cover 19 topics identified in the project specifications. As noted, these Daily Reports should have been but were not retained by TLT.

Magliozzi drafted the baseline schedule for the project, with a run date of February 28, 2012 (the "Baseline Schedule"), and advised MART that the schedule was not subject to review or change, even after MART told TLT that its schedule was unrealistic. The Baseline Schedule showed an early completion date of December 28, 2012. However, for the project to have an early completion date, MART had to approve that date by executing a written change order, which MART did not do. TLT attempted to declare substantial completion on December 18, 2013. Jacobs rejected TLT's unilateral declaration of substantial completion for several reasons, including, among others, that at the time more than one percent of the work on the Project remained incomplete; that MART did not have beneficial occupancy of the garage; that there were life-safety issues in one of the egress stairs, and that TLT did not perform the items enumerated for substantial completion in the Contract documents, including submitting a monetized punch list and a final requisition for payment.

The contractual substantial completion date was August 5, 2013, which TLT did not meet. As a result of TLT's failure to meet substantial completion on time, MART paid additional sums to Ted Fiffy, MART's Owner's Representative, in the amount of $60,568.52, and to Jacobs in the amount of $73,700.

TLT submitted 94 Change Order Requests during the project. TLT never concurrently requested additional time nor submitted an updated schedule showing a purported impact under the contract documents in any of its Change Order Requests although it concurrently requested and subsequently received additional funds in connection with each approved change order.

On or about May 2, 2013, three months before the contractual substantial completion deadline of August 5, 2013, Magliozzi, without advance notice to MART, left the Project to pursue another job. Magliozzi was replaced by Scott Macrae, who made little or no progress with respect to such items as the metal panel system, the design and installation of which were TLT's responsibility. On or about July 11, 2013, Magliozzi returned to the Project as Project Manager. Around this same time, according to Kostinden, TLT's President and sole shareholder, TLT was not functioning as a going concern.

Although it was required to pay its subcontractors within seven days of receipt of monies from MART, TLT at times did not do so. Beginning in or around July of 2013, TLT subcontractors ICON West and D&S Commercial Masonry ("D&S"), filed direct payment claims on the Project.

During August, 2013, TLT conceded that money was overdue to ICON West and D&S. As of October 28, 2013, certain direct payment claims for work performed between April through June 2013, had not yet been paid by TLT. In response to demands for direct payment, MART followed required procedure by escrowing disputed amounts in bank accounts.

7

During this period, MART learned that TLT had not timely paid Roman Ironworks, Canatal and D&A. Certain subcontractors, such as Canatal, threatened to abandon the project; ICON West left the project site, and D&A claimed that due to nonpayment it might no longer be able to operate.

Beginning in August 2013, MART issued notices of default and demands for accounting to TLT, indicating TLT was at risk of being terminated as the General Contractor. These notices and demands were issued because, as noted, MART was receiving payment claims from TLT's subcontractors, and TLT had failed to provide a full accounting showing that it had timely paid all subcontractors for work performed for which MART had paid TLT.

On September 30, 2013, Canatal filed a lawsuit against TLT alleging it was owed $915,663.61. On October 1, 2013, Barker Steel ("Barker") filed an action against TLT alleging it was owed $255,266.17.

On each Application and Certificate for Payment (AIA Document G702) (the "Certified Payment Application") TLT submitted to MART, TLT certified that as of the date of the payment application, TLT had fully and timely paid all its subcontractors for work performed for which TLT received monies from MART. This assertion was not accurate. MART paid TLT directly for all work performed through August 31, 2013. MART reviewed all Certified Payment Applications before approving them. MART would not have approved and paid the applications if TLT had not signed the certification section.

In or around August 2013, Western, TLT's surety, became actively involved in the Project because Western began receiving notices of nonpayment from TLT subcontractors. Earlier in 2013, Western, without prior notice to MART, made demand on TLT for its default under the General Indemnity Agreement between Western and TLT (the "GIA"), based on

TLT's defaults on a number of public construction projects and claims asserted based on those defaults. These defaults and claims were later the subject of a lawsuit filed by Western against TLT on November 6, 2013 in the U.S. District Court for the District of Massachusetts.

On November 5, 2013, Western issued a directive to MART that it not pay TLT without Western's written consent. Thereafter, MART paid Western the remaining Contract balance except, at Western's request, $5000. Despite TLT's requests, Western did not release to TLT any funds received from MART.

In TLT's Answer and Counterclaim in the Federal lawsuit, TLT alleged that Western improperly instructed owners of certain projects not to pay TLT and, as a result caused TLT to be unable to perform and complete its work.  Specifically, TLT stated:

Subsequent to October 18, 2013, Western commenced notifying the owners of each project of TLT for which Western had executed payment and performance bonds that no further payments were to be made to TLT without the explicit written consent of Western. . . .

Western's actions have substantially denied TLT the ability to complete the various outstanding projects [including MART]. Western' [sic] actions have forced TLT to demobilize from substantially all outstanding projects for lack of funds . . .TLT will be terminated on all or substantially all projects in the event that Western continues to deny, interfere and impede the payment of all funds of TLT.

After Western's November 5, 2013 direction and demand to MART, Western began paying TLT's subcontractors, suppliers and payment bond creditors directly. On January 23, 2014, in part to ensure that the critical contractors would be paid, Western, MART and TLT entered into a written agreement that MART pay Western directly.

On October 24, 2013, MART sent notice to TLT and Western that MART was considering declaring a contractor default because of TLT's material breaches of the Contract. Also during October 2013, Western began investigating the bond claims on the Project.

In December 2013, Western brought in Vertex Engineering ("Vertex") to assist Western with its investigation. Vertex began work to complete the Project soon thereafter and eventually did so.

Magliozzi, through Regency Constructors Northeast ("Regency"), filed a payment bond claim through Western in connection with the Project. That claim was not paid.

On December 19, 2013, Magliozzi, through Regency, his company, initiated a lawsuit against Western to recover his fees in connection with the Project. Before this lawsuit, Western had stopped communications with Magliozzi. Western also was not then in communication with Kostinden.

Magliozzi, who usually was on the Project site one day each week, stopped coming to the site after January 21, 2014 because Western refused to pay him. TLT's general liability insurance for the project expired on January 31, 2014.

For the Project to be substantially complete, the owner must be able to occupy the garage and be suitable for use by the public, either by a permanent or temporary certificate of occupancy. As noted, the date of substantial completion for the project was May 19, 2014, and a Certificate of Substantial Completion and Temporary Certificate of Occupancy were issued on that date, which was the first time MART was able to use the first two floors of the garage. A final Certificate of Occupancy was issued on September 4, 2014.

On November 25, 2013, TLT submitted to MART a 600 plus page document, Change Order Request ("COR") 89. This request for equitable adjustment ("REA") was prepared by Magliozzi. The REA sought to increase the contract value by $546,110.95 and extend the date of Substantial Completion by 134 calendar days as a result of allegedly excusable impacts to the Project Schedule through December 2012. After its submission, Berkeley requested a minimum

of 45 additional days beyond the contractual 30 day period to review the extensive and detailed documentation. No formal response occurred.

Examples of the Calendar Days of alleged impact set forth in COR89 include but are not limited to the following:

COR1, which involved installation of both underground and above-ground conduit, conductors and appurtenances necessary to provide power to the electrical cabinet which was to be relocated. The permanent power for this cabinet was not shown on the Contract Drawings. This work allegedly caused 54 Calendar Days of impacts.

COR4 involved necessary aeronautical studies because of the proximity of the Project site to the Fitchburg Municipal Airport. This allegedly impacted the Project Schedule by 112 Calendar Days from March 23, 2012 to July 13, 2012.

COR14 involved an elevation discrepancy on the underground culvert on the westerly side adjacent to Nashua Street that had a three foot difference in elevation impacting the mass cut from the old parking lot.

COR15 arose from the discovery of coal ash. Because of this discovery, MART had to engage a licensed soil professional to determine what contamination was present at the site and prepare a proper disposal plan. TLT asserts this impacted completion of the Project by 23 Calendar Days.

The difference between a contractual, or late, substantial completion date and an early substantial completion date on a construction project is total float. The difference between the contractual substantial completion date and TLT's listed early substantial completion date is 220 days, without taking into account elevator work. When the elevator work is taken into account, the total available project float is 255 days. Both TLT and MART could use the total available

project float. A delay claim cannot be made until total available project float is exhausted. Before making its delay claim in COR89 for 134 days, TLT did not exhaust total available project float, whether calculated as 220 or 255 days.

Although TLT used Primavera critical path method software to generate its schedules for the Project, it never provided MART with an estimate of the additional contract time needed for each of the CORs that comprise the purported 134 days of delay contained in COR 89, even though the software is specifically designed to generate a time impact analysis.

Under its contract with TLT, Canatal, who as noted is not a party to this arbitration, was to fabricate and deliver the Project structural steel and deck by July 1, 2012, followed by a nine week erection period. Canatal fabricated the structural steel for the project in its Roanoke, Virginia location. It subcontracted the structural steel erection. Canatal's original steel erection subcontractor, Bouchard Steel Erectors, LLC ("Bouchard"), lacked the proper certification to erect steel on the project. In late November 2012, Canatal replaced Bouchard with CCS Constructors ("CCS"). The steel erection was further delayed because CCS had not completed requisite Roadway Workers Protection training. In addition, Canatal had quality control issues. Contrary to the contract requirements and express instructions from Jacobs, Canatal galvanized the top flanges, had to submit corrective plans for review by Jacobs, and ultimately had to have ironworkers using hand-held grinders remove the galvanization.

MART paid $294,844.61 for hot-dip galvanizing on the structural steel. Hot-dip galvanizing of structural steel involves a chemical process whereby the steel is cleaned in acid; rust and scale are removed; the steel is rinsed, cleaned, dried, immersed in a bath of molten zinc, and put through a finishing process to remove defects. The Project structural steel was intended to be completely hot-dip galvanized, at a minimum of 3.9 mils.

12

On April 3, 2015, MART's counsel wrote Western, asserting a warranty claim "relating to the galvanizing painting performed throughout the parking facility . . . "   MART requested that Western "take corrective action" with respect to the galvanizing painting.  In support of its warranty claim, MART attached correspondence from Jacobs dated August 1, 2014, which was during the period Vertex and subcontractors were working through the Remaining Work List. The attached Jacobs' correspondence itemized items left to complete on the Remaining Work List as of July 25, 2014.  According to that list, of the four structural steel galvanizing items originally on the Remaining Work List, one, Item 46, remained outstanding as of July 25, 2014. Item 46 addressed Jacobs' request for manufacturer documentation that field applied steel galvanizing performed in cold temperatures during December 2013 constituted an acceptable application. In response, Western referred the issue to Vertex for investigation.

On July 10, 2014, approximately three months after MART's warranty letter to Western, Rob Benoit of MART wrote Vertex.  Benoit had replaced Fiffy as MART's Project Manager, and, as such, was assigned to close-out the Project punch list for MART.  Benoit requested a meeting with Vertex to "resolve the current punch list issues".  He stated that he had "toured the facility and reviewed the items still in contention and after discussing the issues with Bruno Fischer . . . we've come up with a course of action that will be mutually beneficial to Vertex and MART".

During July 28 and 29, 2015, Benoit consulted with Jacobs regarding Item 46;  Jacobs advised ". . . this will likely be a maintenance issue going forward". On August 10, 2015, Pellegri told Benoit: "all work items are complete . . .". In response, Benoit stated that he would "finish the close-out of this project and authorize payment. . ." Thereafter, Benoit told Fisher: "in conclusion, it is my opinion that the punch list for the (Project) is complete and the work

conducted by Vertex was finished to MART's satisfaction. I can recommend that Vertex be paid the retainage amount and that the project be closed out". Benoit copied Jacobs on that letter and attached the "revised punch list". Consistent with Benoit's conclusion that the punch list work was complete as of August 10, 2015, the revised punch list accompanying Benoit's letter states in both type and writing that Item 46 was "done".

On September 21, 2015, Fisher wrote Berkeley and noted Benoit's acceptance of the work and recommendation to close-out the Project and issue payment on the final application for payment. On October 16, 2015, Berkeley certified the final Payment Application as due and payable, referencing MART's conclusions that "all outstanding work has been completed by Vertex to the satisfaction of MART." On November 27, 2015, MART issued payment on the final application to Western.

<div align="center">ANALYSIS</div>

It is undisputed that Massachusetts law applies to all claims raised in this arbitration.

TLT seeks damages of $1,478,496.53, plus interest, for MART's alleged breach of the Contract and its wrongful termination of TLT. Alternatively, TLT seeks to recover the same damages in quantum meruit. MART's Counterclaim alleges breach of contract, breach of warranty and commission of unfair and deceptive acts and practices in violation of Chapter 93A of the Massachusetts General Laws ("the 93A Claim").

As noted, after the evidence concluded but before closing arguments, MART moved to strike the quantum meruit claim on the ground TLT did not comply with Judge van Gestel's Orders regarding the need to specifically assert the claims to be arbitrated by way of a formal pleading. After review of the parties' briefs, the relevant case law, and the procedural history of this arbitration, I conclude that TLT's failure to plead quantum meruit in its five page Notice of

<div align="center">14</div>

Claims filed August 15, 2017 in compliance with Judge van Gestel's Order of August 7, 2017 precludes TLT from relying on quantum meruit as a basis for recovery in this arbitration. That said, as noted below, even had quantum meruit been properly asserted, I would not allow recovery on quantum meruit beyond what I conclude is warranted on TLT's contract claim.

### TLT Materially Breached the Contract by Failing to Substantially Complete Its Work by August 5, 2013.

As the Supreme Judicial Court stated recently, it remains settled law in Massachusetts that "complete and strict performance" is required for all construction contract terms relating to the design and construction of a project. *G4S Technology LLC v. Mass. Technology Park Corp.*, 479 Mass. 721, 723 (June 13, 2018)(hereafter cited as" G4S Technology") Absent such compliance, a contractor cannot recover on the contract. If the complained of conduct does not concern the actual design and construction of the project, the alleged breach is to be analyzed under the materiality standard. In the Commonwealth, a material breach concerns an "essential and inducing feature of the contract". *Id.* There can be no doubt that compliance with the contractual substantial completion date and paying subcontractors on time was an essential and inducing feature of the contract between MART and TLT.

MART has established that it terminated TLT for cause under Section 14.2 of the Contract General Conditions. As noted, Jacobs certified sufficient cause existed based on TLT's failure to reach timely substantial completion and its failure to pay subcontractors. I reject TLT's contention that MART's reliance on these grounds was improper, pretextual or in bad faith.

TLT did not meet substantial completion on the contractually required date, even though time was of the essence under the Contract. Moreover, TLT did not even submit a request for additional time until more than three months after the contractual substantial completion date.

15

Absent a valid extension of time---particularly where an extension had not even been requested-- TLT failed to meet the required substantial completion, and thus TLT materially breached the Contract. In addition, Vertex was the company that substantially completed the project since TLT had been off the Project site for months before Jacobs issued a Certificate of Substantial Completion on May 19, 2014.

As noted, the credible evidence does not support TLT's contention that it met substantial completion as of December 18, 2013 when it issued a unilateral statement to that effect. For the Project to be substantially complete, the owner must be able to occupy the garage, and as Berkeley credibly testified, the garage must be suitable for use by the public, either by a temporary or permanent certificate of occupancy. As of December 18, 2013, neither MART nor the public could occupy or use any part of the garage; the garage elevator was not operational, and the City of Leominster had not issued a certificate for use of the elevator at the Project.

Jacobs rejected TLT's unilateral declaration of substantial completion on December 31, 2013, for justifiable reasons, including that at that time more than one percent of the work on the Project remained incomplete; MART did not have beneficial occupancy of the garage, and TLT failed to perform the items listed for substantial completion in the contract documents, including, among others, submitting a monetized punch list and a final requisition for payment.

<u>TLT Materially Breached the Contract by its Nonpayment of Subcontractors</u>

It is undisputed that TLT was in arrears in payments to certain of its subcontractors even though it received payment in full for work performed by the subcontractors who were owed money. Despite demands from MART, TLT failed to provide adequate evidence of payment to subcontractors within seven days of receipt of funds from MART for the work, a requirement under Section 9.6.4 of the Contract.

As noted, in or around July 2013, subcontractors ICON West and D&S Commercial Masonry filed direct payment claims. In August 2013, TLT conceded that their payments were overdue. As of October 28, 2013, these direct payment claims still had not been paid. During that same period, TLT did not timely pay Roman Ironworks, Canatal or D&A Steel.

In response to the demands for direct payment, MART followed required procedures and escrowed the disputed amounts in bank accounts. Some subcontractors, such as Canatal, threatened to abandon the Project; ICON West left the site, and D&A asserted it might no longer be able to operate because of nonpayment.

Beginning in August 2013, MART issued notices of default and demands for accounting to TLT indicating TLT risked termination. On September 30, 2013, Canatal initiated an action against TLT, claiming it was owed $915,663.61. As of October 1, 2013, Barker Steel initiated litigation against TLT, claiming it was owed $255,266.17. As of October 28, 2013, Barker's payment claim remained unpaid.

After MART's repeated demands for a full accounting, TLT sent copies of certain checks to MART along with Timberline reports. Review of these documents shows TLT failed to comply fully with MART's repeated demands for an accounting.

On November 5, 2013, Western expressly directed MART not to pay TLT:

" . . . Western Surely Co. must direct and demand that no further payments be released to TLT Construction or anyone else, without written consent from my office, as the surety's authorized representative." After this instruction, MART paid Western the entire remaining contract balance, except, at Western's request, $5,000. After November 5, 2013, Western began paying TLT's subcontractors, suppliers and payment bond creditors directly.

Unknown to MART at that time, in early 2013, Western, without prior notice to MART, made demand on TLT for its default under the General Indemnity Agreement between Western and TLT (the "GIA") based on TLT's defaults on various public construction projects and the claims asserted against it based on those defaults, including the ART Project. During this period, also unknown to MART, TLT no longer functioned as a going concern.

TLT's defaults and claims against it were later the subject of an action Western filed against TLT on November 6, 2013, in the U.S. District Court for the District of Massachusetts. Western alleged it faced hundreds of bond claims from subcontractors and suppliers, representing potentially millions of dollars in damages, in its capacity as TLT's surety.

In or about August of 2013, Western started receiving notices of nonpayment from TLT's subcontractors who had not been timely paid. On October 24, 2013, MART sent a notice to TLT and Western that MART was considering declaring a contractor default because of TLT's material breaches of the Contract. In October 2013, Western began investigating the bond claims on the Project. In November 2013, Jortner, Western's Senior Surety Claims Counsel, spoke with MART's counsel "for the purpose of funds control" and to ensure "that job bills would be paid . . . (and) that the job creditors would be paid and the money would not go elsewhere". Months of negotiation followed.

### TLT's Delay Claim of 134 Days in COR89 is Not Compensable Because Total Available Project Float was Not Exhausted and TLT Did Not Comply with Requirements for Making a Delay Claim

The parties bitterly contest who bears responsibility for delays in construction of the Project. The critical path is the longest path from the beginning of the Project to the contractual date of substantial completion. As Magliozzi conceded, not all delays on a construction project impact the critical path, and only those which do so are potentially compensable.

TLT has not carried its burden of proof on its delay claims.   First, TLT failed to request an extension of the contract time and failed to break out the probable effect of the delay concurrently in each of its CORs, as contractually required.   Instead, it bundled 134 days of delay into a separate change order request. Second, TLT failed to exhaust total float of 220 days as required by the Contract, which it was required to do before requesting an extension of the contract time.

As to the first point, Section 15.1.5.1 of the Contract required TLT to give "written notice as provided herein . . . The Contractor's Claim shall include an estimate of cost and of probably effect of delay on the progress of the Work" in order to make a claim for an increase in the contract time.   Section 13.4.2 provides that no "action or failure of act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing."

Section 01250 of the Specifications provides:

1.3 (B) Contractor-Initiated Proposals:  If latent or unforeseen conditions require modifications to the Contract, Contractor may propose changes by submitting a request for a change.
1. Include a statement outlining reasons for the change and the effect of the change on the Work.  Provide a complete description of the proposed change.  Indicate the effect of the proposed change on the Contract Sum and the Contract Time . . . .
2. Include an updated Contractor's Construction Schedule that indicates the effect of the change, including, but not limited to, changes in activity duration, start and finish times, and activity relationship.  Use available total float before requesting an extension of the Contract Time . . . .

Section 01320 (2.2)(F) provides for "each proposed contract modification and concurrent with its submission, prepare a time-impact analysis to demonstrate the effect of the proposed change on the overall project schedule".  In addition, Section 01320 required TLT to use computer software specifically developed to manage construction schedules and update them at

monthly intervals to reflect actual progress. Thus, TLT was precluded under the Contract from bundling its 134 days of delay. It is undisputed that TLT did not concurrently provide a time-impact analysis of any of the CORS submitted "up to December 2012" which allegedly serve as the basis for its claim for 134 days delay.

TLT never attempted to submit a time-impact analysis. A COR is not a time-impact analysis, as Helmes credibly testified. As noted, a time-impact analysis involves a series of activities interrelated in a sequence of events to reach a goal. When a potential delay exists, that is put into the Project network at the time of the notification of the event. A calculation is then rerun based on the logic of that event and its approximate duration to determine whether the event actually affected the critical path which would then reduce float. This is done using the Primavera critical path software TLT employed.

Although TLT used this software to generate its schedules for the Project, it never provided MART with an estimate of the additional contract time needed for each change order request that makes up the purported 134 days delay contained in COR89. Because TLT never provided a time impact analysis to demonstrate the effect of the proposed change on the overall project schedule, MART had no opportunity to evaluate contemporaneously and approve or reject any requested time extension flowing from the change in work in any particular COR.

The difference between a contractual late substantial completion date and an early substantial completion date on a construction project, as Helmes credibly testified, is total available project float. On the Project, the difference between the contractual substantial completion date and TLT's listed early substantial completion date is either 220 days or 255, taking into account the elevator work. The elevator work was originally on the critical path until TLT removed it so it could attempt to declare substantial completion unilaterally.

Both TLT and MART could use the total available float. A delay claim cannot be made until total available project float is exhausted, as Helmes credibly testified, and the critical path to a project is not extended until total available float is exhausted. Because TLT did not exhaust available float, it failed to fulfill a condition precedent to making a delay claim.

<div align="center">The Winter Conditions Claim</div>

TLT seeks to recover $218,000 for Canatal's delay damages from adverse weather delay. In my view, TLT is contractually precluded from asserting this claim against MART, and even if not, TLT failed to provide credible supporting evidence to establish the claim. Canatal is not a party to this arbitration, and there is no evidence before me that Canatal's claims have been assigned to TLT. Thus, TLT lacks standing to assert Canatal's claims.

Even if TLT had standing, this claim is non-compensable. A winter conditions delay claim was never made by CCS, Canatal's subcontractor, against Canatal. Additionally, such a delay claim is precluded by contractual language between TLT and Canatal which includes a no-damages-for-delay provision and a waiver of consequential damages. See Article 4 of the Canatal Subcontract.

The Contract contains a waiver of consequential damages, specifically precluding recovery of home office overhead. Section 15.1.6 provides: "The Contractor and Owner waive Claims against each other for consequential damages . . .includ(ing) damages incurred by the Contractor for principal office expenses. "

Even if Canatal could assert a claim for damages for delay, for TLT to assert such a claim against MART, Section 15.1.5.2 of the Contract required three kinds of documentation: "If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time,

could not have been reasonably anticipated and had an adverse effect on the scheduled construction." As Magliozzi conceded, neither TLT, nor its subcontractors, including Canatal, provided evidence to MART of adverse weather conditions relating to a winter conditions claim.

Furthermore, there is credible evidence that Canatal's own conduct caused delays. As noted, Canatal's steel erection subcontractor, Bouchard, lacked proper certification to erect steel on the Project. From the Spring of 2012, Canatal knew of the certification requirement. As also noted, in late November 2012, Canatal replaced Bouchard with CCS. However, CCS, after replacing Bouchard, had not yet completed Roadway Workers Protection training which further caused delays.

My conclusion on this issue is buttressed by the fact that TLT's "lost" Daily Reports would likely have provided significant information regarding winter conditions. As such, on this issue, I draw a negative inference----namely, that the missing Daily Reports did not document abnormal weather conditions which could not reasonably have been anticipated and which had an adverse effect on scheduled construction.

### TLT's Approved Change Order Requests

On the credible evidence, TLT has established entitlement to payment for Change Order Requests in the amount of $54,257.82. These include the following:

COR2A, submitted on April 6, 2012 for TLT's power consumption for the power supply for the utility cabinet. Magliozzi estimates that a reasonable monthly figure for that consumption is $2080;

COR58R, submitted on January 21, 2014 in the amount of $20,207.43 requested for additional labor, equipment and material costs for modifications made to the electrical room and addition of a maintenance closet;

COR80, submitted on October 8, 2013 in the amount of $13,216.07 for additional costs sought by Roman in connection with the furnishing and installation of an additional handrail;

COR81, submitted on October 8, 2013 in the amount of $5,128.27 for additional costs sought by Roman in connection with the furnishing and installation of eight posts with bases for handrails;

COR83, submitted on October 21, 2013 in the amount of $1,213.28 for additional costs submitted by D&S for furnishing and installation of CMU;

COR84, submitted on December 13, 2013 in the amount of $6,747.29 for additional labor, equipment and material costs sought by D&S;

COR90R, submitted on December 16, 2013 in the amount of $3,247.21 to add a damper at the elevator;

COR91, submitted on January 24, 2014 in the amount of $884.03 for additional labor, equipment and material costs for adding pavement markings;

COR93 in the amount of $1,250 referenced in a proposal dated March 5, 2014 for additional chain link fencing, and

COR94 in the amount of $284.26 to add a Knox box request by the deputy chief of Leominster.

### TLT's Other Change Order Requests

To submit a COR, Section 01250(1.3)(B)(1) of the Project Specifications required TLT to provide the reasons for and effect of the change, provide a complete description of it, and indicate the effect of the change on the Contract sum and time. When TLT failed to do this, Jacobs either rejected the COR or sought more information. If Jacobs requested more information, Section 15.2.4 of the Contract required TLT to furnish additional data within 10

days of receipt of Jacobs' request. Section 15.2.5 of the Contract also provides that Jacobs "initial decision shall be final and binding on the parties but subject to mediation and, if the parties fail to resolve their dispute through mediation to binding dispute resolution."

When such a decision is reviewed on a public construction project, M.G.L. c. 30, section 39J provides that "a decision, by the . . . architect or engineer, on a dispute . . . shall not be final or conclusive if such decision is made in bad faith, fraudulently, capriciously, or arbitrarily is unsupported by substantial evidence, or is based upon error of law".

Magliozzi acknowledged that TLT is seeking compensation for change order requests Jacobs rejected, and that while it disagrees with Jacobs, Jacobs' decisions were made in good faith and were not arbitrary. That concludes the matter under existing case law. There is no credible evidence before me that Jacobs' decisions were arbitrary, capricious or not in good faith.

### The Consequential Damages Issue

TLT also seeks to recover $344,094.95, consisting of its home office overhead of $56,919.18; the home office overhead of Canatal in the amount of $132,809, and $154,366.77 for Indemnification Costs, to cover payments made by Western to Vertex of $53,077.25 and "Western—Legal Fees and Costs" to cover attorneys' fees spent by Western in the amount of $101,289.52.

As noted, neither Canatal nor Western is a party to this arbitration. In addition, these claims are consequential damages precluded by the waiver of consequential damages in Section 15.1.6 of the Contract. In addition, the home office overhead claims of both TLT and Canatal, totaling $189,728.18, are indirect costs expressly precluded by Section 15.1.6 of the Contract. Similarly, the Indemnification Costs, totaling $154,366.77, constitute consequential damages precluded by the waiver provision of the Contract.

24

I am not persuaded by TLT's contention that despite the contractual waiver of consequential damages, it is entitled to relief based on the "true breach" doctrine. That doctrine is available only in "extraordinary circumstances" not present here. See *XL Specialty Ins. Co. v. Commonwealth of Massachusetts, Massachusetts Highway Dept.*, 2013 WL 56123 (Mass. Super. 2013) (Billings, J.), quoting *Sutton Corp. v. Metropolitan Dist. Com'n*, 423 Mass. 200, 21. n. 22 (1996).

### Quantum Meruit

As noted, TLT failed to include a claim for quantum meruit as a claim in its Notice of Claims. Given Judge van Gestel's express directive that the arbitration would be limited to only those claims, I conclude that quantum meruit recovery is unavailable to TLT. Even if it were, the recent SJC case, *G4S Technology*, precludes quantum meruit recovery for TLT given the weight of the credible evidence. "To recover under quantum meruit in a construction case, a contractor must prove both substantial performance of the contract and an endeavor in good faith to perform the work fully." *Id.* at 735. TLT has not established that it met those requirements.

### MART's Counterclaim

On its Counterclaim, MART seeks recovery of fees paid to Jacobs and to Fiffy, MART's representative, incurred after August 5, 2013, in connection with TLT's failure to meet substantial completion in accordance with the contract documents. In addition, MART asserts breach of contract and breach of warranty claims based on TLT's alleged failure to complete with its obligations regarding the structural steel coating on the Project garage. On that claim, MART seeks approximately 2.8M in damages for remediation of the garage.

MART contracted for hot dip galvanizing, which provides the steel with an anticipated practical lifespan of 50 years. Hot-dip galvanizing is marketed for both its superior protection and appearance. MART paid $294,844.61 for the galvanizing.

Scott Robins, MART's expert, opined on TLT's alleged failure to comply with its contractual requirements as to galvanization. He testified that TLT and/or its subcontractors compromised the integrity of the new hot dip galvanizing on the structural steel by failing to properly fabricate and/or protect the structural steel after the galvanizing was applied. He also testified that TLT and/or its subcontractors applied Krylon, a prohibited coating material, in addition to applying ZRC, a touch-up product, in a manner not in compliance with Contract. He testified it was applied in improper weather conditions, without proper preparation and/or with insufficient thickness and coverage.

The structural steel was intended to be completely hot-dip galvanized, at a minimum of 3.9 mils, with application of ZRC Galvilite, the only approved paint, to be used only for areas of touch-up. The lifespan of ZRC is approximately 10-15 years and results in less protection of structural steel than does hot-dip galvanizing. As Berkeley credibly testified, applying ZRC properly is necessary for the material to bond adequately to the structural steel, to cure properly ad to perform effectively. Despite Jacobs' prohibition, Krylon was applied by Canatal or its subcontractors in December 2012 to early January/February 2013.

MART has not carried its burden of proof on its breach of warranty claim. The bulk of MART's evidence on this claim was offered in the form of opinions of Robins, a mechanical engineer with more than 30 years experience working on commercial construction projects. TLT persuasively argues, and I conclude, that Robins lacks the education, training or experience to opine as to steel galvanizing, either in diagnosing problems or prescribing solutions. Robins

26

admitted he had no formal education or training specific to structural steel or its manufacturing, and no formal education or training relating to the process of steel galvanizing, particularly hot-dip galvanizing. Robins also acknowledged that he lacks experience addressing quality issues with galvanized structural steel.

TLT credibly argues that Robins' recommendation of painting *all* the Project's structural steel was not supported by subsidiary documentation. In addition, Robins' credibility was seriously eroded on cross-examination. For example, he testified that the Contract required compliance with various American Society for Testing and Materials ("ASTM") standards with which he said he was familiar. He opined that aesthetics and rust are galvanized structural steel issues of concern. However, ASTM 385 expressly says aesthetics are not a proper consideration for structural steel. As TLT's opinion witness, David C. Prior, credibly testified, "The galvanizers have no control over the chemical content of the steel that they are being asked to galvanize. Steel chemistries vary all over the spectrum." Transcript at p. 1463, ll. 8-11.

Robins' recommended remediation is painting with RD Coating, a product Robins has never used which is not a galvanizing product and which has only been available for about 12 years. Neither the contract, nor the ASTM, nor the physical conditions of the Project support Robins' opinion that the Project's structural steel should be painted three times over the next 40 years at a projected expense of 2.8 Million. Buttressing my conclusion on this point is that the entire Project cost was about 7.5 Million, and the structural steel manufacturing and erection was valued at 2.2 Million.

The testimony of TLT's steel galvanizing expert, Prior, who has four decades of steel galvanizing experience, contrasted markedly with Robins. Although Prior is not an engineer, he has worked for the American Galvanizing Association and has been involved with the National

Association of Corrosion Engineers and in writing standards with the ASTM. He has also been involved in educating the design and construction community as to steel galvanizing best practices, and he has participated in hundreds of galvanized structural steel inspections and remediations.

Based on his training and experience, Prior credibly opined to a reasonable degree of professional certainty that the Project steel galvanizing is not failing. He also testified that aesthetics is not a proper consideration when evaluating galvanized structural steel, and that Robins' remedial plan, three times repainting the garage, is not practical or cost-effective. He further opined that paint on galvanized steel ultimately will fail.

While Prior acknowledged there may some field galvanizing touch-up to be performed pursuant to the method described in ASTM A780, he also testified that the galvanized structural steel at the Project is performing per the Contract and the Specifications, including the 10 year warranty.

I credit Prior's testimony. Because the weight of the credible evidence supports Prior's opinions, I conclude that MART has not carried its burden of proof on its breach of warranty counterclaim, either as to liability or damages.

I turn next to MART's claim that it is entitled to recoupment of additional fees paid to Jacobs and to Fiffy, a MART consultant, because of TLT's failure to make substantial completion on time. TLT contends that neither it nor Western had any notice during the entire 2014/2015 completion period that MART had or were incurring costs for Fiffy and Jacobs that were TLT's responsibility. I do not find notice was required. The credible evidence, particularly from Fisher and Berkeley, is that MART paid additional sums to Fiffy of $60,568.52 and to

Jacobs of $73,700 because of the delay in substantial completion. Therefore, MART is entitled to reimbursement of that total amount – namely, $134,268.52.

### MART's Chapter 93A Claim

MART asserts that TLT violated Chapter 93A by willfully misrepresenting the status of its subcontractor payments in order to induce MART to continue paying TLT. MART also alleges that TLT knowingly maintained a baseless delay claim against MART. This claim is based on TLT changing its claim from 339 to 134 days of delay in its Pre-Hearing Submission dated December 29, 2017, without requesting leave from the Predecessor Arbitrator.

TLT argues as a threshold matter that MART was exercising a government function with respect to the Project and thus was not a person engaged in trade or commerce as required under the express terms of Chapter 93A. I am not convinced that MART as a public entity acting pursuant to a legislative mandate is acting in a business context and therefore engaged in trade or commerce for the purposes of Chapter 93A. See *G4S Technology*; *Peabody, N.E. Inc., v. Town of Marshfield*, 426 Mass. 436 (1998). However, I conclude that TLT waived this defense by admitting in its Answer to the Counterclaim that MART was engaged in trade or commerce.

Turning to the merits of the 93A claim, after careful assessment of the credible evidence, I conclude that MART has not carried its burden of showing that any of the conduct it complains of rises to the level of Chapter 93A liability. On the basis of the credible evidence, MART has not carried its burden of establishing the requisite intent to deceive, bad faith or willfulness on the part of TLT which would give rise to Chapter 93A liability.

<u>Interest</u>

The parties are entitled to interest on the damages they are owed.  As noted, after I issued an Interim Award, the parties conferred and submitted on November 12, 2018, via email communication that they agreed as follows:

- Interest should run from November 7, 2013 for 5 years.
- TLT is entitled to interest of 2.65% per year, or 13.25%.  <u>See</u> G.L. c. 231, 6I
- MART is entitled to interest of 12% per year, or 60%.  <u>See</u> G.L. c. 231, 6C

Based on these interest rates, MART is entitled to an award of interest in the amount of $80,561.11 ($134,268.52 x .12 x 5), for a total award of $214,829.63 ($134,268.52 + $80,561.11), and TLT is entitled to an award of interest in the amount of $7,189.16 ($54,257.82 x .0265 x 5), for a total award of $61,446.98 ($54,257.82 + $7,189.16).

<u>AWARD</u>

For the foregoing reasons, it is hereby ordered that:

(i)     MART's motions to strike TLT's quantum meruit claim and to strike Exhibits 137 and 138 are allowed;

(ii)    TLT Construction Corp. is entitled to damages of  $54,257.82 plus interest in the amount of $7,189.16, for a total award of $61,446.98;

(iii)   Montachusett Regional Transit Authority is entitled to damages of $134,268.52 plus interest in the amount of $80,561.11, for a total award of $214,829.63;

(iv)    The parties are to bear their own attorneys' fees and costs, and

(v)     All other claims and defenses are denied.

_Margaret R. Hinkle_
Margaret R. Hinkle, Arbitrator
November 14, 2018

# SERVICE LIST

| | | |
|---|---|---|
| **Case Name:** | TLT Construction Corp. vs. Montachusett Regional Transit Authority | **Hear Type:** Arbitration |
| **Reference #:** | 1400016619 | **Case Type:** Construction |
| **Panelist:** | Hinkle, Margaret R., | |

---

## Jonathan C. Burwood

Hinshaw & Culbertson LLP

Jonathan C. Burwood
28 State St
24th Floor
Boston, MA 02109
jburwood@hinshawlaw.com

Claimant
Phone: 617-213-7000
Fax: 617-213-7001

**Party Represented:**
TLT Construction Corp.

## Paula-Lee Chambers

Hinshaw & Culbertson LLP

Paula-Lee Chambers
28 State St
24th Floor
Boston, MA 02109
pchambers@hinshawlaw.com

Claimant
Phone: 617-213-7000
Fax: 617-213-7001

**Party Represented:**
TLT Construction Corp.

## Thomas J. Conte

Mirick O'Connell

Thomas J. Conte
100 Front St.
Suite 1700
Worcester, MA 01608
tconte@mirickoconnell.com
Assistant's Emails: smccann@mirickoconnell.com

Respondent
Phone: 508-791-8500
Fax: 508-983-6274

**Party Represented:**
Montachusett Regional Transit Authority

## Harvey B. Heafitz

Davagian Grillo & Semple LLP

Harvey B. Heafitz
365 Boston Post Road
Suite 200
Sudbury, MA 01776-3043
harvey@dgslawllp.com

Claimant
Phone: 978-443-3773
Fax: 978-443-7773

**Party Represented:**
TLT Construction Corp.

## Alexandra N. Mansfield

Mirick O'Connell

Alexandra N. Mansfield
100 Front St.
Suite 1700
Worcester, MA 01608
amansfield@mirickoconnell.com

Respondent
Phone: 508-791-8500
Fax: 508-791-8502

**Party Represented:**
Montachusett Regional Transit Authority



## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: TLT Construction Corp. / Montachusett Regional Transit Authority
Reference No. 1400016619

I, Gabrielle Thorp, not a party to the within action, hereby declare that on November 14, 2018, I

served the attached Final Award on the parties in the within action by Email and by depositing true copies

thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Boston,

MASSACHUSETTS, addressed as follows:

Harvey B. Heafitz Esq.
Davagian Grillo & Semple LLP
365 Boston Post Road
Suite 200
Sudbury, MA  01776-3043
Phone: 978-443-3773
harvey@dgslawllp.com
   Parties Represented:
   TLT Construction Corp.

Paula-Lee Chambers Esq.
Jonathan C. Burwood Esq.
Hinshaw & Culbertson LLP
28 State St
24th Floor
Boston, MA  02109
Phone: 617-213-7000
pchambers@hinshawlaw.com
jburwood@hinshawlaw.com
    Parties Represented:
    TLT Construction Corp.

Thomas J. Conte Esq.
Alexandra N. Mansfield Esq.
Mirick O'Connell
100 Front St.
Suite 1700
Worcester, MA  01608
Phone: 508-791-8500
tconte@mirickoconnell.com
amansfield@mirickoconnell.com
   Parties Represented:
   Montachusett Regional Transit Authority

I declare under penalty of perjury the foregoing to be true and correct. Executed at Boston,
MASSACHUSETTS on November 14, 2018.

Gabrielle Thorp
GThorp@jamsadr.com

MIRICK O'CONNELL

Western Surety Company
CNA Surety Corporation
November 13, 2018
Page 3

We look forward to hearing from you.

Sincerely,

Thomas J. Conte

TJC/amn

cc: Paula-Lee Chambers, Esq. (via email)
Jonathan C. Burwood, Esq. (via email)

| CIVIL ACTION COVER SHEET | DOCKET NUMBER<br>2085CV00676 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

**PLAINTIFF(S):** Montachusett Regional Transit Authority

**ADDRESS:** R1427 Water Street, Fitchburg, Massachusetts

**COUNTY** Worcester

**DEFENDANT(S):** Western Surety Company

**ATTORNEY:** Thomas J. Conte, Esq.; Alexandra N. Mansfield, Esq.

**ADDRESS:** Mirick, O'Connell, DeMallie &* Lougee, LLP

100 Front Street

Worcester, MA  01608

**ADDRESS:**

**BBO:** BBO #566092; BBO #697163

### TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO.<br>D99 | TYPE OF ACTION (specify)<br>Other Equity Action | TRACK<br>F | HAS A JURY CLAIM BEEN MADE?<br>[X] YES   [ ] NO |
|---|---|---|---|

**"If "Other" please describe:**

| Is there a claim under G.L. c. 93A?<br>[X] YES   [ ] NO | Is this a class action under Mass. R. Civ. P. 23?<br>[ ] YES   [X] NO |
|---|---|

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

#### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ........................................................................................................... $_____
2. Total doctor expenses ............................................................................................................. $_____
3. Total chiropractic expenses ..................................................................................................... $_____
4. Total physical therapy expenses ............................................................................................. $_____
5. Total other expenses (describe below) .................................................................................... $_____
Subtotal (A): $_____

B. Documented lost wages and compensation to date .................................................................. $_____
C. Documented property damages to date ..................................................................................... $_____
D. Reasonably anticipated future medical and hospital expenses ................................................. $_____
E. Reasonably anticipated lost wages ........................................................................................... $_____
F. Other documented items of damages (describe below) .............................................................. $_____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$_____

#### CONTRACT CLAIMS
(attach additional sheets as necessary)

[ ] This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

Provide a detailed description of claim(s):

The plaintiff asserts claims against the defendant, a surety company, for violations of G.L. c. 93A and G.L. c. 176D and seeks up to treble damages, plus attorneys' fees and costs.

TOTAL: $ >$25,000

**Signature of Attorney/ Unrepresented Plaintiff:** X _____     **Date:** 6/26/2020

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

**Signature of Attorney of Record:** X _____     **Date:** 6/26/2020

E-Filed
6/26/2020

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
WORCESTER DIVISION
CIVIL ACTION NO. 2085CV676-C

MONTACHUSETT REGIONAL TRANSIT
AUTHORITY,
    Plaintiff

V.

WESTERN SURETY COMPANY,
    Defendant

**MOTION FOR SPECIAL
PROCESS SERVER**

    The Plaintiff Montachusett Regional Transit Authority moves that the Court, pursuant to

Mass. R. Civ. P. 4C, appoint a special process server, Francis J. Trapasso & Associates, by its

constables, agents or disinterested persons who are qualified, over the age of eighteen,

knowledgeable in the service of process and who are not parties in this action, because of special

knowledge, long experience and the need for immediate service upon Western Surety Company.

7/21/2020  SO ORDERED,

James G. Reardon
Associate Justice

ATTEST: Anne Cler   Asst Clerk

Notices Mailed 7/21/2020

Client Matter 20081/00023/A6600425.DOCX

COMMONWEALTH OF MASSACHUSETTS
DIVISION OF INSURANCE
1000 WASHINGTON STREET. SUITE 810
BOSTON, MA 02118-6200



WESTERN SURETY COMPANY
Attn: Jonathan D. Kantor
333 S. Wabash, 43S
Chicago, IL 60604

Mail Investigator # 4

BOSTON, MA 02118-6200



# COMMONWEALTH OF MASSACHUSETTS
## Office of Consumer Affairs and Business Regulation
### DIVISION OF INSURANCE
1000 Washington Street • Suite 810 • Boston, MA  02118-6200
(617) 521-7794 • FAX (617) 521-7475
http://www.mass.gov/doi

CHARLES D. BAKER
GOVERNOR

KARYN E. POLITO
LIEUTENANT GOVERNOR

MIKE KENNEALY
SECRETARY OF HOUSING AND
ECONOMIC DEVELOPMENT

EDWARD A. PALLESCHI
UNDERSECRETARY

GARY D. ANDERSON
COMMISSIONER OF INSURANCE

August 26, 2020

WESTERN SURETY COMPANY
Attn: Jonathan D. Kantor
333 S. Wabash, 43S
Chicago, IL 60604

### Re: Service of Process

Dear Mr. Kantor:

Enclosed you will find legal process which was served upon the Commissioner of Insurance, in his capacity as attorney and registered agent for, Service of Process* for a foreign insurance company, as provided for in Massachusetts General Laws, Chapter 175, §151(3) and §154.

* **Please note: All future inquiry or correspondence should be directed to the attention of the attorney of record of the enclosed documents.**

Sincerely,

*Stacy Siegan*

Stacy Siegan
Assistant to the General Counsel
(617) 521-7310

Enclosure(s)

9A723374
39961

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
WORCESTER DIVISION
CIVIL ACTION NO. 2085CV00676

---

MONTACHUSETT REGIONAL TRANSIT
AUTHORITY,
    Plaintiff

    V.

WESTERN SURETY COMPANY,
    Defendant

**MOTION TO STAY COUNT I**

---

The Plaintiff Montachusett Regional Transit Authority ("MART") hereby moves this

Court to issue an order staying Count I (Breach of Contract) of MART's Amended Complaint in

the above-captioned action, pending resolution of its contemporaneous Appeal to the

Massachusetts Appeals Court in another matter, dockets <u>Canatal Steel USA v. TLT Construction</u>

<u>Corp. & Another, Massachusetts Appeals Court No. 2020-P-0319, Lower Court No:</u>

<u>1381cv04262</u> and <u>Barker Steel LLC v. Montachusett Regional Transit Authority & Others,</u>

<u>Massachusetts Appeals Court No. 2020-P-0320, Lower Court No: 1781cv00002</u> (collectively,

the "Appeal"), on the grounds that the Appeal may touch on and potentially resolve some or all

of the issues raised by Count I of this action, and, accordingly, in an abundance of caution,

MART seeks to stay this Count pending the decision of the Appeals Court. Upon receipt of a

decision in the Appeal, MART will notify this Court, and will proceed accordingly.

WHEREFORE, Plaintiff Montachusett Regional Transit Authority, requests that the

Court issue an Order staying Count I (Breach of Contract) of MART's Amended Complaint in

this action for the reasons described above.

A True Copy, Attest

Constable, Boston, MA    Date

8/14/20

Client Matter 20681/00023/A6679774.DOCX



MONTACHUSETT REGIONAL
TRANSIT AUTHORITY

By its attorneys,


_____/s/ Thomas J. Conte_____
Thomas J. Conte, Esq.
BBO #566092
Phone: (508) 860-1523
Fax:    (508) 983-6274
tconte@mirickoconnell.com
Alexandra N. Mansfield, Esq.
BBO #697163
Phone: (508) 929-1644
Fax:    (508) 983-6244
amansfield@mirickoconnell.com
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477

Dated: August 12, 2020

## CERTIFICATE OF SERVICE

I, Thomas J. Conte, Esq., hereby certify that a copy of the foregoing document, will be

served by in-hand service to Western Surety Company, c/o Commissioner of Insurance

Massachusetts Division of Insurance, 1000 Washington Street, Suite 810, Boston, MA 02118.


Dated:  August 12, 2020

_____/s/ Thomas J. Conte_____
Thomas J. Conte, Esq.